726 P.2d 648

Jerry VANNOY and Nadine Vannoy, husband and wife, Plaintiffs-Respondents, Cross appellants,

v.

UNIROYAL TIRE COMPANY, Defendant-Appellant, Cross Respondent.

No. 15529.

Supreme Court of Idaho.

Nov. 22, 1985.

On Rehearing Sept. 10, 1986.

Thomas B. High of Benoit, Alexander & Sinclair, Twin Falls, for defendant-appellant, cross respondent.

Kenneth L. Pedersen of Webb, Burton, Carlson, Pederson & Paine, Twin Falls, for plaintiffs-respondents, cross appellants.

BAKES, Justice.

Uniroyal, a tire manufacturer has appealed from a judgment awarding damages to plaintiffs in a products liability action stemming from a tire explosion accident. Plaintiffs have cross appealed from an order for remittitur of a portion of damages for loss of consortium or, in the alternative, granting a new trial. We reverse in part and remand for a new trial limited to the question of liability.

Jerry Vannoy was a tire manager for a business which sold and repaired tires. On October 6, 1980, Vannoy was attempting to mount a 16-inch tire on a 16.5-inch rim with the use of a tire mounting machine. Vannoy testified that on this occasion he was not aware of the difference in size; however, he further testified that, had he been aware, he would have still attempted to mount the tire since he had successfully mounted 16-inch tires on 16.5-inch rims on previous occasions. While Vannoy was filling the tire with air and attempting to get the tire bead to properly seat against the rim, the tire exploded. The explosion propelled the tire and rim into the ceiling and seriously injured Vannoy, leaving him with a permanent impairment to his right arm.

Vannoy and his wife filed a complaint for damages against the tire manufacturer, Uniroyal; the wheel rim manufacturer, Kelsey-Hayes Co.; the mounting machine manufacturer, The Coats Co., Inc.; a trade association, The Tire & Rim Association, Inc.; and the seller of the rim wheel, Terry Brennan. Brennan was granted summary judgment and was dismissed from the case. Vannoys dismissed the Tire & Rim Association without prejudice, and Coats and Kelsey-Hayes settled separately with the Vannoys prior to or during trial.

The case proceeded to trial against the single defendant, Uniroyal. The major claim at trial against the defendant Uniroyal was whether the tire contained a design defect consisting of an alleged weak spot in

the bead of the tire. Other issues included the adequacy of warnings, Vannoy's alleged misuse of the product, and the alleged contributing factors of the rim and the tire mounting machine. Although the plaintiffs' case originally included a negligence claim, that theory was dropped during the trial and the case was submitted to the jury solely on the theory of strict liability for the alleged defective design of the tire and the alleged inadequate warnings.

The defendant Uniroyal requested a special verdict form which would have allowed the jury to assign a percentage of fault or causation to Coats for the allegedly defective tire mounting machine, and to Kelsey-Hayes for the allegedly defective wheel rim. The trial court denied the request.

The jury returned a verdict finding that Uniroyal "contributed to the cause of the accident" by 90% and Vannoy by 10%. The jury also found Vannoy's total damages to be $224,688, with his wife's loss of consortium damages at $74,895. All post trial motions were denied with the exception of a motion for a remittitur on the damages awarded for loss of consortium. The trial court ruled that the evidence would not support the jury's award of $74,895 for loss of consortium and therefore granted a new trial unless the plaintiffs accepted a remittitur which reduced the loss of consortium damages to $20,000. Vannoys accepted the remittitur claiming a reservation of rights on appeal.

Uniroyal has appealed assigning several points of error, the principal assignment being the refusal of the trial court to allow the special verdict form to list Coats and Kelsey-Hayes for the purpose of having all or a portion of the causation for the accident and injuries attributed to the mounting machine and wheel rim. Vannoys have cross appealed from the order granting the new trial unless plaintiffs accept a remittitur of a substantial portion of the loss of consortium damages.

## I

We first address the issue of whether the trial court erred by refusing to submit a special verdict form which would have permitted the jury to consider and compare the percentage of causation which Coats' and Kelsey-Hayes' mounting machine and wheel rim contributed to the accident. Both had previously settled out of the case. The trial court ruled that the "jury can only attribute fault under the strict liability law in this action on one of two parties, Uniroyal and the plaintiff." Even though the trial court permitted Uniroyal to argue to the jury that the other two manufacturers, and not Uniroyal, had proximately caused the accident, there was no place on the verdict form for the jury to reflect such a conclusion, and the verdict form directed that the plaintiffs' and Uniroyal's contributing cause must add up to 100%. We hold that in refusing to include Coats and Kelsey-Hayes on the verdict form, the trial court erred.

In several of our prior cases we have held that, in tort actions based on negligence,

"It is established without doubt that, when apportioning negligence, a jury must have the opportunity to consider the negligence of all parties to the transaction, whether or not they be parties to the lawsuit and whether or not they can be liable to the plaintiff or to the other tortfeasors either by operation of law or because of a prior release." *Lasselle v. Special Products Co.*, 106 Idaho 170, 172, 677 P.2d 483, 485 (1983), *quoting from Pocatello Industrial Park Co. v. Steel West, Inc.*, 101 Idaho 783, 787, 621 P.2d 399, 403 (1980).

"... [T]rue apportionment cannot be achieved unless that apportionment includes all tortfeasors guilty of causal negligence either causing or contributing to the occurrence in question, whether or not they are parties to the case." *Pocatello Industrial Park Co. v. Steel West, Inc.*, 101 Idaho at 787, 621 P.2d at 403, *quoting from* Heft & Heft, Comparative Negligence Manual § 8.131 (1978).

While we have not addressed this issue in tort cases based solely upon strict liability rather than negligence, many courts have addressed the problem of how responsibility should be allocated for damages in tort cases based upon strict liability, or a mixture of negligence and strict liability. The Supreme Court of Texas, in its recent decision of *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d 414 (Tex.1984), has made a comprehensive analysis of the cases dealing with that issue. In analyzing the cases, the court stated:

"In recent years, products liability litigation has spawned so many intractable problems of loss allocation between negligent plaintiffs and negligent and strictly liable defendants that our brief ex-

pression of concern in [*General Motors Corp. v.*] *Simmons* [558 S.W.2d 855 (Tex.1977)] now seems understated. [Citations omitted.] ... Courts have had to wrestle with various problematic indemnity doctrines and to recognize 'shadowy distinctions between defenses in products cases and negligence cases.' Thus, manufacturers have often borne accident costs generated in part by the substandard conduct of the plaintiff or some third party. [Citation omitted.]

"Product liability suits which are not based on negligence are treated anomalously because the system of allocation provided in Art. 2212a [the Texas comparative negligence statute, similar to I.C. § 6–802] does not apply, and there is no other comprehensive system for loss allocation under existing law. This court has previously attempted to ameliorate the harsh and inequitable consequences stemming from this anomalous treatment of loss allocation in products liability actions. Thus, instead of recognizing 'all or nothing' issues in product misuse and breach of implied warranty cases, we created comparative apportionment schemes. [Citation omitted.] Nevertheless, our limited efforts in [past cases], though positive, have not substantially alleviated the intolerable confusion, unmanageability, and inherent unfairness in this area of Texas products law. [Citation omitted.] As a result, we have been implored repeatedly to recognize some form of comparative fault in strict products liability actions. [Citations omitted.] ....

....

"A significant majority of the numerous commentators addressing the question have strenuously urged the implementation of comparative fault, also referred to as comparative responsibility or comparative causation, as a means of distributing accident costs among negligent plaintiffs, negligent defendants, and strictly liable defendants. [Citations omitted.] They have pointed out on the one hand that strict products liability is not *absolute* liability—that is, product suppliers are not insurers of the safety of their products. On the other hand, 'all or nothing' strict liability defenses are outmoded and undesirable doctrinal throwbacks resulting in unfairness to plaintiffs, to defendants, and to other product purchasers who ultimately absorb the loss through price setting. [Ci-

tations omitted.] In the absence of apportionment, some manufacturers bear the total expense of accidents for which others are partly to blame, while other manufacturers totally escape liability even though they have sold defective products. Either result is unacceptable.

"Unfairness, however, is not the only serious flaw of virtually ignoring plaintiff and third party misconduct in strict products liability actions. The failure to allocate accident costs in proportion to the parties' relative abilities to prevent or to reduce those costs is economically inefficient. [Citation omitted.] An ideal tort system should impose responsibility on the parties according to their abilities to prevent the harm. Existing law, however, encourages manufacturers to make safety improvements that are not cost justified, while failing to deter the substandard conduct of other tortfeasors. [Citation omitted.] Thus, equitable and rational risk distribution, a fundamental policy underlying the imposition of strict products liability, logically depends on the existence of some system for comparing causation in cases involving plaintiff or third party misconduct.

"For these reasons, most of the courts addressing the issue have decided to adopt some form of comparative causation for strict liability in tort. These decisions have often been preceded by extensive discussions of the procedural and policy benefits of proportionate loss allocation. [Citations omitted.] We agree with these courts that applying principles of comparative apportionment to strict products liability not only furthers the policy goals of [the Restatement (Second) of Torts] § 402A, but also simplifies the submission of products cases.

"Courts applying comparative fault in strict liability actions have taken several valid approaches. In *Daly v. General Motors Corp.*, 20 Cal.3d 725, 575 P.2d 1162, 144 Ca.Rptr. 380 (1978), the California Supreme Court, unencumbered by a comparative negligence statute, extended its judicially formulated comparative negligence system to actions involving both negligence and strict liability claims because 'logic, justice, and fundamental fairness' required it. *Id.* 575 P.2d at 1172, 144 Cal.Rptr. at 390. ....

"Several other courts have interpreted comparative negligence statutes as en-

compassing strict liability in tort. In the leading case of *Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967), for example, the Wisconsin Supreme Court characterized strict liability as negligence per se, or negligence as a matter of law, because it arises from a violation of a standard of safety and requires no showing of foreseeability of harm. It followed, then, that the Wisconsin comparative negligence statute must apply to strict liability as well. Minnesota has adopted the 'Wisconsin rule.' *See Busch v. Busch Construction Co.*, 262 N.W.2d 377, 393 (Minn.1977); *see also* Jensvold, A Modern Approach to Loss Allocation Among Tortfeasors in Products Liability Cases, 58 Minn.L.Rev. 723, 748–51 (1974); Uniform Comparative Fault Act § 1 comment (1977).

"In *Suter v. San Angelo Foundry & Machine Company*, 81 N.J. 150, 406 A.2d 140, 145–46 (1979), the New Jersey Supreme Court also applied its comparative negligence statute to strict liability in tort. Instead of characterizing strict liability as negligence per se, however, the court determined that the New Jersey legislature intended to allow the apportioning of accident costs according to 'fault,' a concept subsuming negligence. *Id.* at 145. One reason given for this conclusion was that New Jersey adopted the provisions of the Wisconsin comparative negligence statute after the Wisconsin Supreme Court in *Dippel* had already applied its statute to strict liability. The court then observed that distributing an unsafe product is a departure from a required standard of conduct—in other words, fault. Accordingly, the court held that the statute required the comparison of fault between negligent and strictly liable parties. Other courts have used similar reasoning in applying comparative negligence statutes to strict liability actions. *See Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.*, 411 F.Supp. 598, 603 (D.Idaho 1976); *Kennedy v. City of Sawyer*, 229 Kan. 439, 618 P.2d 788, 796–97 (1980); *Baccelleri v. Hyster Company*, 287 Or. 3, 597 P.2d 351, 354–55 (1979).

"Finally, some courts in jurisdictions with comparative negligence statutes have declined to interpret those statutes to encompass strict products liability cases, but have nevertheless judicially adopted separate comparative causation systems for such cases. In *Thibault v.*

*Sears, Roebuck & Co.*, 118 N.H. 802, 395 A.2d 843 (1978), for instance, the New Hampshire Supreme Court held that its comparative negligence statute did not apply to strict liability cases because the statute referred only to actions for negligence, but 'judicially recognize[d] the comparative concept in strict liability cases parallel to the legislature's recognition of it in the area of negligence.' 395 A.2d at 848, 850. *See also Stueve v. American Honda Motors*, 457 F.Supp. 740, 751–56 (D.Kan.1978) (predicting that the Kansas Supreme Court would not apply its comparative negligence statute, but would probably instead adopt a comparative system in strict liability cases as a principle of common law).

. . . .

"Many courts and commentators have labeled this type of loss allocation system comparative *fault*. We choose comparative *causation* instead because it is conceptually accurate in cases based on strict liability and breach of warranty theories in which the defendant's 'fault,' in the traditional sense of culpability, is not at issue. The trier of fact is to compare the harm caused by the defective product with the harm caused by the negligence of the other defendants, any settling tortfeasor and the plaintiff." *Duncan v. Cessna Aircraft Co.*, 665 S.W.2d at 424–27 (emphasis in original).

In 1971 the legislature enacted Chapter 8, Title 6, Idaho Code, which provides for comparing of contributory negligence between parties on a percentage basis, and states:

"6–801. **Comparative negligence—Effect of contributory negligence.**—Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence or gross negligence resulting in death or in injury to person or property, if such negligence was not as great as the negligence or gross negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering."

This comparative negligence scheme was held applicable to products liability actions based on negligence. *See Henderson v. Cominco American, Inc.*, 95 Idaho 690, 518 P.2d 873 (1973). With this Court's adoption of strict liability in 1973, it was

held that "contributory negligence in the sense of misuse of the product, or in the sense of voluntarily and unreasonably proceeding in the face of a known danger are good defenses to strict liability." *Shields v. Morton Chemical Co.*, 95 Idaho 674, 677, 518 P.2d 857, 860 (1974). This necessity of comparing the contributory negligence of one party with the strict liability of a defendant resulted in the well-reasoned conclusion of the United States District Court for the District of Idaho that:

"The rationale of comparative negligence was meant to apply as well in a products liability action, such that misuse may not be an absolute bar to recovery. Applying Idaho's comparative negligence statute in this way is consistent with the policy underlying strict products liability, namely the spreading of loss to manufacturers who are best able to absorb it. Upon a finding of blameworthy conduct, the jury in this case was asked, consistent with Idaho law, to assign a percentage to the causative conduct of the parties to this lawsuit.[5]

"[Footnote] 5. Once culpability, blameworthiness or some form of fault is determined by the trier of fact to have occurred, then the labels denoting the 'quality' of the act or omission, whether it be strict liability, negligence, negligence per se, etc., becomes unimportant. Thus, the underlying issue in each case is to analyze and compare the causal conduct of each party, regardless of its label." *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.*, 411 F.Supp. 598, 603 (1976).

Subsequent to the *Sun Valley* decision, in *Odenwalt v. Zaring*, 102 Idaho 1, 624 P.2d 383 (1980), this Court was faced with a specific issue of interpretation of the comparative negligence statute, I.C. § 6–801. The Court stated:

"The above statute, enacted in 1971, is virtually identical to the Wisconsin comparative negligence statute in effect in 1971. Wisconsin was one of a few states which pioneered the concept of comparative negligence.... This court has consistently held that '[a] statute which is adopted from another jurisdiction will be presumed to be adopted with the prior construction placed upon it by the courts of such other jurisdiction.' *Nixon v. Triber*, 100 Idaho 198, 200, 595 P.2d 1093, 1095 (1979). *State v. Miles*, 97 Idaho 396, 545 P.2d 484 (1976); *Doggett v. Electronics Corp. of America*, 93 Idaho 26, 454 P.2d 63 (1969). Therefore, in the absence of some other legislation which would clearly suggest a different result, we should follow the interpretation which the Wisconsin Supreme Court had placed upon their comparative negligence statute prior to 1971." 102 Idaho at 4–5, 624 P.2d at 386–87 (footnotes omitted).

Prior to the enactment of I.C. § 6–801, the Wisconsin Supreme Court had already construed its comparative negligence statute as being equally applicable to the theory of strict liability as well as the theory of negligence, just as the United States District Court for Idaho held in the *Sun Valley* case. *See Dippel v. Sciano*, 37 Wis.2d 443, 155 N.W.2d 55 (1967). Accordingly, comparative responsibility or comparative causation in strict liability cases was consistent with, and indeed probably mandated by the prior interpretation placed upon the Wisconsin version of I.C. § 6–801, which the Idaho legislature adopted. *Odenwalt v. Zaring, supra.*

In Idaho's scheme of comparative responsibility:

" 'It is established without doubt that, when apportioning negligence, a jury must have the opportunity to consider the negligence of all parties to the transaction, whether or not they be parties to the lawsuit and whether or not they can be liable to the plaintiff or to the other tortfeasors either by operation of law or because of a prior release.' *Connar v. West Shore Equipment of Milwaukee, Inc.*, 68 Wis.2d 42, 227 N.W.2d 660, 662 (1975).

" 'The reason for such [a rule] is that true apportionment cannot be achieved unless that apportionment includes all tortfeasors guilty of causal negligence either causing or contributing to the occurrence in question, whether or not they are parties to the case.' Heft & Heft, Comparative Negligence Manual § 8.131, at 12 (1978)." *Pocatello Ind. Park Co. v. Steel West, Inc.*, 101 Idaho 783, 787, 621 P.2d 399, 403 (1980).

The practice of having the jury list or find all contributing causes has even been applied where the parties are unknown. *Jensen v. Shank*, 99 Idaho 565, 585 P.2d 1276 (1978). The practice has been approved or adopted in many of our cases involving different circumstances. *See, e.g., Runcorn v. Shearer Lumber Products, Inc.*, 107 Idaho 389, 690 P.2d 324 (1984); *Lasselle v. Special Products Co.*, 106 Idaho 170, 677 P.2d 483 (1983); *Pocatello Ind. Park Co. v. Steel West, Inc.*, 101 Idaho 783,

621 P.2d 399 (1980); *Tucker v. Union Oil Co. of Calif.*, 100 Idaho 590, 603 P.2d 156 (1979); *Jensen v. Shank,* 99 Idaho 565, 585 P.2d 1276 (1978). While we have never considered the practice in a specific products liability action based solely on the theory of strict liability, the policies underlying the practice of attributing responsibility to every alleged tortfeasor, whether or not a party to the action, are equally applicable to products liability actions based upon strict liability as well as actions based on negligence or other tort theories.

> "Once culpability, blameworthiness or some form of fault is determined by the trier of fact to have occurred, then the labels denoting the 'quality' of the act or omission, whether it be strict liability, negligence, negligence per se, etc., becomes unimportant. *Thus, the underlying issue in each case is to analyze and compare the causal conduct of each party, regardless of its label."* *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.*, 411 F.Supp. 598, 603, n. 5 (1976). (Emphasis supplied.)

Products liability actions usually include all theories of liability including both negligence and strict liability. In the present case, both negligence and strict liability theories were pursued by the plaintiff until nearly the end of the trial, when the negligence theory was dropped. The use of differing allocation schemes, depending upon whether the theory was negligence or strict liability, would merely add to the confusion existing in this already complicated area of the law.

■ The products liability act, Chapter 14, Title 6, Idaho Code, states:

> "The previous existing applicable law of this state on product liability is modified only to the extent set forth in this act." I.C. § 6-1401.

Nothing in the products liability act modifies the approved and required practice of comparing the responsibility of all alleged tortfeasors on a special verdict form, whether or not those alleged tortfeasors are parties to the action. Although products liability claims based on strict liability are a common law innovation of this Court emanating from the *Shields* case, the legislature did address the issue of comparative responsibility in the Products Liability Act of 1980. In that act the legislature adopted the same scheme of comparative responsibility for products liability actions as it had enacted in 1971 in the comparative negligence statute. *Compare* I.C. §§ 6-1304 and 6-801. We have interpreted I.C. § 6-801, the comparative negligence statute, to require all negligent actors contributing to the causation of any accident or injuries to be listed on the jury verdict form, whether or not they are parties to the action. *Lasselle v. Special Products Co., supra; Pocatello Ind. Park Co. v. Steel West, Inc., supra.* Reason and consistency in statutory interpretation dictate that products liability cases based on strict liability should be treated the same. I.C. § 6-1304, providing for comparative responsibility in products liability actions, is substantially identical to I.C. § 6-801 which provides for comparative responsibility in negligence actions.[1] They should be treated the same.

■ Plaintiffs argue that the evidence did not support the listing of Coats and Kelsey-Hayes on a special verdict form since a *prima facie* case of strict liability was not shown against each manufacturer. This argument requires a review of the evidence. The plaintiffs' own expert witness supplied detailed evidence to the effect that the tire mounting machine manufactured by The Coats Co. and the wheel manufactured by Kelsey-Hayes contained design defects and inadequate warnings which contributed to the accident. In the expert's opinion the tire mounting machine should have been designed with a pressure

---

1. The identical nature of those two comparative responsibility statutes is clearly evident when they are viewed in tandem:

> "**6-801. Comparative negligence—Effect of contributory negligence.**—Contributory negligence shall not bar recovery in an action by any person or his legal representative to recover damages for negligence or gross negligence resulting in death or in injury to person or property, if such negligence was not as great as the negligence or gross negligence of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of negligence attributable to the person recovering."

> "**[6-1404] 6-1304. Comparative responsibility.**—Comparative responsibility shall not bar recovery in an action by any person or his legal representative to recover damages for product liability resulting in death or injury to person or property, if such responsibility was not as great as the responsibility of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of responsibility attributable to the person recovering."

line regulator and an over-pressurization alert system which would have helped to avoid the accident. He also testified that the machine was defective in that it acted as a "launching pad" as a contributing factor to the accident. The expert also testified that the wheel involved in this case manufactured by Kelsey-Hayes contributed to the accident. He described the "anomaly in the design" of the 16.5-inch wheel which permitted an improper but similarly sized 16-inch tire to be mounted on the wheel without a safety feature preventing the tire from being introduced on the wheel. This defect in design was a precondition of the explosion and was the "fuse of the bomb," as stated by the expert. Finally, the expert testified that the warning and size markings on the wheel were inadequate.

The evidence detailed above was much more extensive than the evidence presented in *Fouche v. Chrysler Motors Corp.*, 107 Idaho 701, 692 P.2d 345 (1984), which we there held to be sufficient to submit to the jury on the issue of strict liability. In *Fouche*, the only evidence presented by the plaintiff was that, prior to the accident, plaintiff had performed a test which consisted of sitting in the driver's seat and leaning forward to find that the seat belt did not allow his body to touch the steering wheel. There was further evidence that in the accident his body impacted on the steering wheel and the windshield. The Court held that the inference from that evidence, together with testimony that the seat belt and collapsible steering wheel were designed to prevent such impact and injuries, was sufficient to present to the jury the issues of defects in the seat belt and steering column which were proximate causes of Fouche's injuries. Regarding the quantum of evidence necessary to raise a jury issue, the Court in *Fouche* stated:

> "Finally, we note that where, as in the present case, the motion for directed verdict concerns the issue of proximate cause, it is only in the rare situation in which reasonable minds could not reach different conclusions that the trial court is justified in removing the issue from the consideration of the jury. [Citation omitted.] The issue of causation is generally reserved for the jury unless the proof is so clear that all reasonable minds would construe the facts and circumstances in the same manner. [Citation omitted.]
> ....

> "The question is merely *whether*, giving full consideration to the evidence produced by the plaintiff and every legitimate inference which can be drawn therefrom, *the product defect was a substantial factor in causing the injuries suffered.* [Citations omitted.] The conduct of the manufacturer need not be the sole factor or even the primary factor, in causing the plaintiff's injuries, but merely a *substantial* factor therein." *Fouche v. Chrysler Motors Corp.*, 107 Idaho 701, 704, 629 P.2d 345, 348 (1984) (emphasis in original).

In the present case, based upon the evidence submitted by plaintiffs' own expert and the standard applied in *Fouche v. Chrysler, supra,* the jury would have been entirely justified in allocating to the mounting machine manufactured by Coats, and to the wheel rim manufactured by Kelsey-Hayes, some or all of the responsibility for proximately causing the damages to the plaintiffs. Accordingly, it was reversible error for the trial court to refuse to include them on the jury verdict form. *Lasselle v. Special Products Co.*, 106 Idaho 170, 677 P.2d 483 (1983).

▪▪▪▪ Plaintiffs nevertheless assert that a *prima facie* case against the Coats Company and Kelsey-Hayes would require a showing, among other things, of when the tire mounting machine or wheel rim were manufactured; the standard in the industry at that time; and whether or not they had been altered or changed without their knowledge or consent prior to the accident. Plaintiffs assert that failure to make such a showing would have precluded a judgment being rendered against Coats and Kelsey-Hayes, and thus they should not have been listed on the special verdict. However, our prior decision in *Fouche v. Chrysler, supra,* did not require such a showing. More importantly, however, in determining comparative responsibility or comparative causation it is not necessary to establish that all persons included on the verdict form would be liable for some or all of the damages attributable to their conduct or their product. Indeed, in many instances, it will not be possible to establish liability for various reasons including immunity, settlement, failure to join as a party, unknown identity, statute of limitations, or numerous other possible causes. In determining whether or not to include additional parties on the verdict form, the question is not whether a judgment would or

could be rendered against that person, but whether or not his conduct or his product caused or contributed to the accident and injuries. Thus, in the case of the Coats Company and Kelsey-Hayes, the issue is whether the tire mounting machine and the wheel rim were the cause, in whole or in part, of the accident and injuries to the plaintiffs. If they were, the special verdict form should require the jury to allocate that causation to them, regardless of whether the Coats Company and Kelsey-Hayes could have a judgment rendered against them as a result of the damage caused by their tire mounting machine and the wheel rim.

Accordingly, we conclude that the trial court was required to include their names on the jury verdict form in order for the jury to evaluate and attribute to their products (the tire mounting machine and the wheel rim) that portion of the cause of the accident which those two items contributed or were responsible for. *Lasselle v. Special Products, Inc., supra; Pocatello Ind. Park Co. v. Steel West, Inc., supra.* It is enough in the present case that evidence in the record identified Coats and Kelsey-Hayes as manufacturers of products containing defects which proximately caused or contributed to, in whole or in part, the damages complained of. We need not, and do not, decide in this action to what extent the judgment or the issues actually litigated would be binding upon the non-parties, Coats and Kelsey-Hayes, in subsequent litigation.[2]

## II

Since we are reversing for a new trial on the issue of liability, it is unnecessary for us to address all of the other issues raised by Uniroyal on appeal. However, we will address Uniroyal's assignments of error on appeal which may reoccur on retrial.

### A.

■ Prior to trial one of the defendants, the Tire & Rim Association submitted requests seeking an admission that plaintiff was aware that mounting a 16-inch tire on a 16.5-inch rim could result in an explosion, and that he would not have attempted to mount the tire had he realized the differ-

ence in size. The association was subsequently dismissed from the action, and the requests for admissions were not answered or denied. Just prior to trial, the plaintiffs made a motion to have the requests for admissions "discarded." The defendant argued that the requests should be deemed admitted since they were not answered or denied within fifteen days as required by I.R.C.P. 36(a). The trial court granted the motion to discard the requests for admissions under the circumstances of the case. We find no error in the trial court's ruling. The plaintiffs' motion was in essence a motion pursuant to I.R.C.P. 36(b) which permits the trial court to withdraw admissions under appropriate circumstances. No prejudice occurred to Uniroyal since plaintiffs' statements in depositions and interrogatories set out plaintiffs' position which adequately denied the substance of the requests for admissions submitted by the association.

### B.

■ We also find no error in the trial court's allowance of Dr. Surbaugh to testify in place of plaintiff's treating physician who was unavailable at trial. Dr. Surbaugh was an associate of plaintiff's treating physician, and his testimony was offered as being substantially the same as the treating physician's testimony would be, and further testifying from the same medical records which the treating physician would have testified from. Uniroyal objected to the testimony on the basis that Dr. Surbaugh was a surprise witness and that Uniroyal had no opportunity to prepare for the testimony. The trial court admitted the testimony, subject to being later excluded upon Uniroyal's showing of prejudice. Uniroyal did not cross examine Dr. Surbaugh, nor did it ever take the opportunity to articulate any basis of prejudice to the trial court. Neither has Uniroyal articulated to this Court on appeal how it was prejudiced by the doctor's testimony. The trial court's decision to allow such a witness is discretionary. I.R.C.P. 26(e)(4) states, "If a party fails to seasonably supplement his responses as required in this rule 26(e), the trial court *may exclude* the

2. Plaintiffs have settled with those manufacturers. However, a settling tortfeasor is not necessarily released from liability to other joint tortfeasors for actions in contribution or indemnification. I.C. §§ 6–804, –805, –806; Annot., 8 A.L.R.2d 196 (1949) (contribution between joint tortfeasors as affected by settlement with one or

both by person injured or damaged); *Holve v. Draper,* 95 Idaho 193, 505 P.2d 1265 (1973). The issue of how the Coats and Kelsey-Hayes *settlement agreements may affect any obli*gation for contribution or indemnity to Uniroyal is not at issue in this case, and we venture no opinion on the resolution of that issue.

testimony of witnesses...." We conclude that the trial court did not abuse its discretion by refusing to exclude the testimony since the testimony was substantially similar to that which Uniroyal was notified of and supposedly was prepared to cross examine.

### III

We now address the question of whether the trial court erred in granting a new trial unless plaintiffs accept a remittitur reducing the damages for loss of consortium from $74,895 to $20,000. Plaintiffs argue on cross appeal that the trial court abused its discretion in granting the remittitur and, in the alternative, a new trial. Uniroyal argues on appeal that the loss of consortium damages should have been reduced to zero and that no substantial competent evidence was submitted to sustain any finding of loss of consortium damages. The trial court found that "the actual evidence introduced on loss of consortium was very sketchy and would not justify an award of damages in the amount of $74,895.81.... Accordingly, I will grant defendant's motion for a new trial unless plaintiffs agree to reduce the damages award to Nadine Vannoy for loss of consortium to $20,000." Plaintiffs accepted the remittitur attempting to reserve its rights on appeal.[3]

■ An award of damages for loss of consortium should be supported by substantial competent evidence of the loss of services, society, companionship, sexual relations, etc. *See* 41 Am.Jur.2d Husband & Wife §§ 455, 456, 457 (1968). However, we agree with plaintiffs that an award for loss of consortium damages may also be supported by circumstantial evidence such as the extent of the injury and hospitalization. In the present case, plaintiffs presented no direct evidence of the husband and wife relationship or the losses to that relationship. The loss of consortium damages could only be supported, if at all, by circumstantial evidence of the extent of the injury, hospitalization and an inference from Mrs. Vannoy's very limited testimony which states that "our home lifestyle changed after the accident...."

■ When considering defendant's motion for a new trial or reduction of damages based upon the defendant's assertion that the damages were excessive and motivated by passion or prejudice, the trial court properly weighed the evidence to consider what he would have awarded had he been a juror.

"The question is answered only by a *weighing* of the evidence, and considerations of doing substantial justice. That is the function of the trial court, conferring upon that court a power and commensurate obligation unequaled elsewhere in civil cases tried to a jury.

"... Trial courts, unlike jurors, have the advantage of having heard *and determined* many hundreds of damage claims. A trial court in a jury trial hears exactly the same evidence as the jury hears, and makes his own inward assessments of credibility and weight. So, when after a trial the jury returns a verdict which is thereafter assailed, either as excessive or as inadequate, the trial court's judgment is then called into play, requiring of him a *weighing* of the evidence....

. . . .

"Where a motion for a new trial is premised on inadequate or excessive damages, the trial court *must* weight the evidence and then compare the jury's award to what he would have given had there been no jury. If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice, the verdict ought not stand." *Dinneen v. Finch*, 100 Idaho 620, 624–25, 603 P.2d 575, 579–80 (1979) (emphasis in original).

Therefore, on plaintiffs' cross appeal we find that the trial court did not abuse its discretion in weighing the evidence and concluding that the damages were excessive and the evidence could only support a finding of $20,000 damages for loss of consortium. The order did not infringe upon plaintiffs' right to a jury trial since plaintiffs could have elected to accept a new jury trial.

Since we have found no basis for error affecting the evidence of damages or the jury's formulation of a damage amount as properly remitted by the trial court and accepted by the plaintiffs, we reverse the judgment of the trial court and remand the case for a new trial consistent with this opinion but limited to the issue of liability.

---

3. Uniroyal does not contest the right of plaintiffs to cross appeal the grant of the new trial after having accepted the remittitur. Therefore, we accept plaintiffs' cross appeal without addressing the issue of whether a party can accept a remittitur and then appeal from it.

Costs to appellant. No attorney fees on appeal.

DONALDSON, C.J., and SHEPARD, J., concur.

HUNTLEY, Justice, concurring in part and dissenting in part.

### I.

I concur in Parts I and II of the majority opinion. Part I provides that the negligence of the wheel manufacturer and the mounting machine manufacturer should have been placed on the special verdict form for comparison of causation. I concur therein with some reservation in that the better rule of law might be to submit on the verdict form only actual parties to the case. An exception would be parties not properly before the court such as an employer in a case by an employee suing where negligence of both a third party and his employer is involved.

Only where the issue of the negligence of the "phantom defendant" is fully litigated can the jury realistically fix a percentage of causation. In the instant case, had Uniroyal truly desired to have a percentage of negligence assigned to the two missing parties, it could have filed a third party complaint or cross-complaint against them holding them in the case even though the plaintiff had dismissed them prior to trial. Accordingly, my preference would be that we require further briefing and analysis by counsel before rendering this decision which may have unanticipated consequences. Being forced to vote at this time, I join the majority based upon the analysis in *Duncan v. Cessna Aircraft Company*, 665 S.W.2d 414 (Tex.1984).

### II.

I respectfully dissent from Part III of the majority opinion wherein the remittitur on loss of consortium is affirmed. The majority correctly quotes the rule of *Dinneen v. Finch* which authorizes a district court to enter remittitur:

"... If the disparity is so great that it appears to the trial court that the award was given under the influence of passion or prejudice."

The majority opinion by citing *Dinneen* implies that the trial court properly considered and applied the *Dinneen* standard. The fact is, the trial court made no such finding, simply ruling that there was not enough (only sketchy) evidence in the record to sustain the award. We cannot properly supply the finding of passion or prejudice on appeal. The pertinent portion of the memorandum order is noted below in footnote.[1]

The trial court simply stated the evidence was sketchy. Sketchy or not, if there are facts in the record to sustain the jury, the judge does not have the power to overrule the jury and substitute his judgment unless he can fairly conclude the jury was acting under passion or prejudice. Although Mrs. Vannoy only testified for two pages of transcript, the trial court should have considered the extensive testimony about the injuries to Mr. Vannoy from which the effect on his relationship to the marital community is most obvious. Mr. Vannoy had a "blast type" injury to his upper right arm, he had multiple operations including skin grafting and installation and removal of plates, he sustained injuries to the muscles and linings over the bones, injuries to his ulnar nerve, injuries to the tendons that relate to the thumb, and he developed chronic arthritis from which he was still suffering at the time of trial and from which the doctor testified he would probably never recover.

From my vantage point I have noticed an increasing propensity among both trial and

---

1. The court, having reviewed the briefs on file and hearing oral argument, took the Motion for Remittitur regarding the claim of Nadine Vannoy under advisement. A letter opinion was issued April 3, 1984. The Court stated therein:

    "The Court finds that the actual evidence introduced on loss of consortium was very sketchy and would not justify an award of damages in the amount of $74,895.81. If I were sitting on the case, I would have awarded damages of $10,000.00. I feel that the jury's decision also deserves some weight. Accordingly, I will grant defendant's Motion for a New Trial unless plaintiffs agree to re-

    duce the damages awarded to Nadine Vannoy for loss of consortium to $20,000.00.

    IT IS HEREBY ORDERED, ADJUDGED AND DECREED:

    That Defendant's Motion for Remittitur is hereby granted and that Nadine Vannoy's loss of consortium damages are reduced to $20,000.00.

    That Defendant's Motion for a New Trial is hereby granted unless Plaintiffs agree to reduce judgment as set forth above and acknowledge same in writing within 7 days or a new trial shall be ordered."

appellate judges to usurp the fact finding province of the jury under various pretexts. A judge's oath of office includes a promise to support and defend the federal and state constitutions, both of which provide that the jury is the finder of facts such as to the extent of damages—we should restrain ourselves from gathering unto ourselves the power which the people have placed in the hands of the jury.

Accordingly, I would reverse the trial court's decision relative to remittitur and remand for him to reconsider his decision under a proper application of the *Dinneen* standard.

BISTLINE, Justice, concurring in the opinion of HUNTLEY, Justice, as to Part I of the majority opinion, but dissenting from Part II.

To better understand why Justice Huntley's views are correct, I submit that Uniroyal has been less than precise in seeking a remittitur from both Mr. Vannoy and Mrs. Vannoy. Otherwise stated, Uniroyal's own confusion without doubt confused the trial court, and the majority of this Court may prefer to remain confused rather than examine the record.

In its opening brief, Uniroyal states as Issue No. 5:

Did the trial court abuse its discretion in failing to reduce the verdict awarded to Nadine Vannoy, or in failing to order a new trial?

Under section V of its points and authorities it states:

The award of damages to Nadine Vannoy is *unsupported by the evidence.*
*Dinneen v. Finch,* 100 Idaho 620, 603 P.2d 575. *Papp v. Cantrell,* 96 Idaho 751, 536 P.2d 746. *Seppi v. Betty,* 99 Idaho 186, 579 P.2d 683 (1978).

In its argument, p. 41, it states: "Uniroyal moved, at the conclusion of the trial, for remittitur or new trial upon the basis that the verdict was unsupported by the evidence *and* was based upon passion or prejudice. R., Vol. I, p. 241." Uniroyal's post-judgment motions were double-barreled, as use of the word *"and"* indicates:

Defendant Uniroyal moves this Honorable Court, pursuant to *Rule 59(a)(5)* of the Idaho Rules of Civil Procedure, and in the interest of justice, for an Order of Remittitur, reducing the jury verdict of damages to accurately reflect the Plaintiffs' damages.

In the alternative to both foregoing Motions, Defendant moves this Honorable Court, pursuant to *Rules 59(a)(1),* (3), (5), *(6)* and (7) for an Order granting a new trial. Defendant's Motion for a New Trial is *based upon the following specific errors* which occurred during the course of this case:

. . . .

(3) Rule 59(a)(5)—The verdict of the jury as to damages is grossly excessive and unreasonable under the evidence, and was the result of and given under the influence of passion or prejudice.

(4) Rule 59(a)(6)—The verdict is contrary to the weight of the evidence. The verdict is contrary to law. Some of the reasons the verdict is contrary to the evidence or law are as follows:

. . . .

(g) The evidence presented by Plaintiffs regarding damages was speculative and based upon conjecture.

(h) No evidence was presented by Plaintiff regarding damages sustained by Nadine Vannoy.

(i) The verdict of the jury grossly exceeded any evidence of Plaintiffs damages and was based upon passion or prejudice.

R., Vol. I, p. 242–245 (emphasis added).

Uniroyal submitted no supporting brief to the trial court. The following is the sum total of Uniroyal's oral argument directed at obtaining a remittitur of the damages awarded to both plaintiffs, Jerry Vannoy and Nadine Vannoy. Uniroyal argued this much and no more:

We've also brought, pursuant to Rule 59(a)(5), a motion for remittitur. As this Court is aware, the jury awarded Jerry Vannoy $224,688.43. The jury awarded Nadine Vannoy $74,895.81.

With respect to the evidence presented by Mr. Vannoy, he did, in fact, break his arm, there was evidence his arm had been broken, and that he had lost some work, and that his arm was not fully healed. However, there was also evidence that the arm was still in the healing process, that he's currently working, has a job, he now has a better job than he's ever held before, that he's lifting and using his arm, and we feel that the verdict rendered by the jury of $225,000, approximately, although it may not be enough to suggest, it may not be enough to justify a finding that it was, in fact, based on prejudice or passion, is sheerly speculation and that, the Court should grant the remittitur.

With respect to the award to Nadine Vannoy, as you recall she only testified for a few moments on the stand, didn't put any evidence on as to her injury or her loss, only that she said Jerry periodically rubs his arm. We feel that a remittitur is absolutely essential in this case, should the judgment notwithstanding, or a new trial not be granted. Under case law the Court may weigh the evidence, and if the Court decides the jury verdict is great enough to suggest, not prove but to suggest that the jury acted improperly, it may order a remittitur.

Counsel for the plaintiffs, in his memorandum in opposition to our motion for remittitur, has listed numerous cases. We ask the Court to ignore those, to stay with the court cases, what it heard as the basis, not the hearsay statements of other publications. We would urge the Court here, as in the Van Kommen vs. Weyerhauser to grant the remittitur.

Tr., Vol. 4, pp. 704–05.

The foregoing argument is contained in four short paragraphs, the first and fourth of which are but informative. The second paragraph—addressing the claim for a remittitur of Jerry Vannoy's damage award (a claim which would not be pursued on the appeal)—contains the only mention of pas-

sion or prejudice. Closely read it is a concession, if not absolute at least tantamount to being one, that the scant evidence recited "may not be enough to suggest, it may not be enough to justify a finding that it [the special verdict setting the figure of $225,000] was in fact based on passion or prejudice."

The second paragraph, addressing the jury's finding of damages sustained by Nadine Vannoy—the claim or issue brought to us on appeal, argues not passion or prejudice, but that she had not "put any evidence on as to her injury or her loss," because of which lack of evidence, "the Court may weigh the evidence," and, if believing the jury acted improperly, may reduce the damages.

Counsel apparently forgot that he had attacked plaintiff's damages under both Rule 59(a)(5) and 59(a)(6), and made it far less than clear at oral argument whether he wanted the trial court to weigh Nadine Vannoy's damages under Rule 59(a)(5) or (a)(6). It is not surprising then that the trial court, in ruling on the motions, was of the view that Uniroyal wanted it to reduce the award to Nadine Vannoy to that amount which he thought was sustained by all of the evidence. That the judge did so is evident by an order which makes no mention of Rule 59(a)(*5*) or of *Dinneen.* R., Vol. I, p. 259. *That order was drawn by counsel for Uniroyal.* R., Vol. I, p. 259.

Accordingly, there is much to what Justice Huntley states as to the issue of Nadine Vannoy's damages. For certain the majority in their discussion of this issue is as guilty here of inattentive reading of the record as it is in ignoring that the primary issue—comparative responsibility under the 1980 Products Liability Reform Act—which it addresses comes up on denial of a motion for new trial—a motion the denial of which was absolutely mandated, assuming that the Court meant what it said recently in *Scafco Boise, Inc. v. Rigby and Mason,* 98 Idaho 432, 566 P.2d 381 (1977).[1]

1. A unanimous decision. Sitting on that case from today's majority were Chief Justice Donaldson and Justice Bakes.

BISTLINE, Justice, concurring and dissenting from the majority opinion.

The majority's dramatic alteration of I.C. § 6–1401 *et seq.*—Idaho's Product Liability Reform Act—ignores the plain wording of statutory law, abrogates the legislature's intent, and usurps the legislature's functions. On two accounts the majority has seriously erred in holding that it was error on the district court's part in not allowing the jury to consider the conduct of Kelsey-Hayes and the Coats Company—two nonparties at trial. First, it was the legislature which declared the procedures in determining comparative *responsibility* in a products liability case, and the evidence at trial dealing with the products manufactured by Kelsey-Hayes and by Coats did qualify for jury consideration. Second, there was not substantial and competent evidence in the record which would have justified the placing of these parties on the verdict form.

### I.

The majority relies on two cases, *Pocatello Industrial Park Co. v. Steel West, Inc.*, 101 Idaho 783, 621 P.2d 399 (1980), and *Lasselle v. Special Products Co.*, 106 Idaho 170, 677 P.2d 483 (1983) to support its position. Both the cases are readily distinguishable at the outset; both are *negligence* cases. The verdict and judgments thereon which we here review resulted from a trial centering around the issue of Uniroyal's *strict products liability.* In *Lasselle*, the most recent of the two decisions, this Court was careful to point out that:

since the plaintiff was awarded damages under the *negligence theory*, we hold that the trial court erred in not placing D & B Supply Company on a special verdict form because in a *negligence action* it is imperative that the jury have the opportunity to consider the *negligence* of all the parties to the transaction. *Pocatello Industrial Park, supra.*

*Id.* at 172, 677 P.2d at 485 (emphasis added).

Thus it is seen that *Lasselle* simply adhered to the precedent of *Pocatello Industrial*, both negligence cases. But neither *Pocatello* nor *Lasselle* are authority for requiring a district court to place nonparties on a special verdict form *in a strict products liability case.* The district court so ruled. Nor did Uniroyal furnish the Court with any other authority of precedential value in that theretofore unexplored area of the law.

The justification for placing nonparties on a jury verdict in *Pocatello Industrial* and in *Lasselle* was couched in the same language:

[T]rue apportionment cannot be achieved unless that apportionment includes all *tortfeasors guilty of causal negligence* either causing or contributing to the occurrence in question whether or not they are parties to the case.

*Lasselle*, 106 Idaho at 172, 677 P.2d at 485, quoting *Pocatello, supra,* 101 Idaho at 787, 621 P.2d at 403 (emphasis added).

In both cases the Court cited Heft & Heft, *Comparative Negligence Manual* § 8.131, at 12 (1978), and other comparative *negligence* cases, but no authority was cited which stemmed from strict products liability cases.

The authority and rationale for comparative negligence in Idaho is a *statutory* one found in I.C. § 6–802:

The Court may, and when requested by any party shall, direct the jury to find separate special verdicts determining the amount of damages and the percentage of negligence attributable to each party; and the Court shall then reduce the amount of such damages in proportion to the amount of negligence attributable to the person recovering.

Entirely contrary to what Justice Bakes would envision, I.C. § 6–1304, which allows for some comparison of responsibility in products liability actions, reads differently:

**Comparative Responsibility**—Comparative responsibility shall not bar recovery in an action by any person or his legal representative to recover damages

for product liability resulting in death or injury to person or property, is such responsibility *was not as great as the responsibility of the person against whom recovery is sought,* but any damages allowed shall be diminished in the proportion to the amount of responsibility attributable to the person recovering. (Emphasis added.)

The difference is substantial. Under § 6–1304, *comparison is of responsibility between the person against whom recovery is sought [the defendant], and the person recovering [the plaintiff].*

I.C. § 6–1305, entitled "Conduct Affecting Comparative Responsibility" specifies conduct which can be compared against the defendant's conduct in a products liability action, specifically, (1) the claimant's failure to observe an obvious defect, (2) the use of a product with a known defective condition, by either a claimant or a non-claimant, or, (3) the misuse or alteration of a product by either a claimant or a non-claimant, shall subject the claimant's damages to reduction or apportionment. *Such are the statutorily controlling directives in allowing the comparison of responsibilities in products liability actions in Idaho.* Thus, in order for the majority to declare in this case that either Kelsey-Hayes or Coats Company comes under one of the categories set out in § 6–1305, it must be able to point to that language in the statutory authority which would have authorized the trial court to allow the jury to assess some degree of comparative responsibility to Kelsey-Hayes or to Coats, for using the defective tire, and/or for misusing and/or altering it. Of course, neither used it, and equally, neither misused it or altered it.

Carefully, and the trial bar may say deviously, the majority avoids applying I.C. §§ 6–1304 and 6–1305. Instead, the majority contentedly writes: "I.C. § 6–1304 ... is substantially identical to I.C. § 6–801 which provides for comparative responsibility in negligence actions. *They should be treated the same.*" Majority opinion, p. 542, 726 P.2d p. 654 (emphasis added). This

may very well be the champion of all *ipse dixits.* No reason is given for these statements; no authority is supplied to support these assertions. Nowhere is the existence of I.C. § 6–1305 ever mentioned. How the majority can so completely ignore the crucial applicability of the legislature's statute is beyond belief.

Many courts have considered the impact of concepts of comparative negligence or fault to strict liability actions. The majority cites several decisions which acknowledge that comparative *responsibility* is an issue in strict liability actions. There is, however, a solid line of authority which hold inapplicable comparative negligence of fault principles in strict liability actions. *See Kinard v. Coats Co.,* 37 Colo.App. 555, 553 P.2d 835, 837 (1976); *Melia v. Ford Motor Co.,* 534 F.2d 795, 802 (8th Cir.1976); *Kirkland v. General Motors Corp.,* 521 P.2d 1353, 1367 (Okla.1974); *Roy v. Star Chopper Co.,* 584 F.2d 1124, 1133 (1st Cir. 1978), *cert. denied,* 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979); *Smith v. Smith,* 278 N.W.2d 155, 160–61 (S.D.1979); *Seay v. Chrysler Corp.,* 93 Wash.2d 319, 609 P.2d 1382, 1384 (1980).

In its detailed examination of the cases discussing the role of comparative fault in product liability actions, the majority simply goes astray. The issue before the Court today is not whether comparative fault, applies in Idaho. The Court judicially adopted it in *Shields v. Morton Chemical Co.,* 95 Idaho 674, 518 P.2d 857 (1974); the Idaho legislature followed suit and occupied the field in 1980 by enacting what the legislature called the Product Liability Reform Act. *The question before the house is whose conduct, i.e., the conduct of what individuals and entities, should be considered when addressing the question of comparative responsibility.* That question, too, has been answered by the legislature, and the majority would be well advised to commence its analysis by first addressing that which the legislature has said.

For this reason, all of the cases upon which the majority relies are far off point

in that none of those decisions discuss or interpret comparative responsibility in light of a relevant state statute, let alone one similar to Idaho's.

The legislature's Product Liability Reform Act's system of comparative responsibility is not contrary to any consensus in those cases discussing comparative responsibility under product liability enactments. It represents one of several schemes of comparative responsibility—a *public policy* choice on the part of the Idaho legislature that it is the best system.[2] It should not therefore be so brazenly modified. To do so constitutes judicial activism in its most regrettable form. The trial court's decision not to include nonparties Coats and Kelsey-Hayes on the special verdict form was correct and should not be so readily reversed, especially to oblige the manufacturer of a dangerously defective tire whose only effort to establish any kind of a case against them fell far short and consisted only of using plaintiff's expert witness as its own in what most practitioners will see as improper cross-examination. *See* part VI, *infra.*

## II.

### A.

The non-party corporations, Kelsey-Hayes Company and Coats Company, should not have been put on the verdict form for the additional reason that the elements required for *any* kind of comparative fault assessable to either were not established at trial.

It is the general rule that before nonparties are placed on jury verdict forms there must be a showing that the requisite elements of a cause of action against them must have been presented at trial. There must have been admitted into evidence proof sufficient to make a case in negligence, where applicable, or in strict products liability, where applicable, before any non-party can be included on the form. *Lasselle, supra,* 106 Idaho at 173, 677 P.2d at 486. For instance, it is beyond dispute that where there is no evidence that a plaintiff was contributorily negligent, where applicable, or comparatively negligent, where applicable, the jury should not be instructed to consider plaintiff's conduct. *See, e.g., Hundt v. LaCrosse Grain Co.,* 425 N.E.2d 687, 704 (Ind.App.1981); *Batten v. Michel,* 15 Md.App. 646, 292 A.2d 707, 712 (1972); *Gutterman v. Biggs,* 249 Md. 421, 240 A.2d 260, 262 (1968); *Jennings v. Hodges,* 80 S.D. 582, 129 N.W.2d 59, 64 (S.D.1964).

This Court in prior days has recognized as much, and has held that there must be substantial evidence to support the legal theory to justify any instruction on that theory. *See, e.g., Johnson v. Clearwater Stage Lines, Inc.,* 96 Idaho 389, 391, 529 P.2d 1261, 1263 (1974); *Edwards v. Walker,* 95 Idaho 289, 292, 507 P.2d 486, 489 (1973); *McIntire v. Engle,* 90 Idaho 63, 66, 408 P.2d 159, 160 (1965); *Kuhn v. Dell,* 89 Idaho 250, 253, 404 P.2d 357, 358–59 (1965); *Schwandt v. Bates,* 88 Idaho 131, 133, 397 P.2d 244, 245 (1964).

In this case, there was insufficient proof of any negligence on the part of either Kelsey-Hayes or the Coats Company.[3] There is no proof in the transcript as to *when* the tire mounting machine or the rim were manufactured. Therefore, other than by sheer speculation, it would have been impossible for the jury to determine when the tire mounting machine or the wheel were manufactured. How a jury could decide if either Kelsey-Hayes or Coats Company failed to use ordinary care when it is impossible to know when these machines were designed or manufactured is an unknown. It may very well be that both the tire mounting machine and wheel were manufactured before the first tire bead

---

2. In recent times, I have believed myself being educated to the philosophy that public policy is never a proper concern for the courts, even in an area where the legislature has not yet spoken.

3. See Part B, *infra,* discussing the insufficiency of evidence as it relates to any strict liability claim against either the Kelsey-Hayes Company or the Coats Company.

failed. It may equally be the fact that these products were manufactured before it was economically and technologically feasible to make any changes in them. How could the jury in this case have decided that the designers and manufacturers of the tire mounting machine and the wheel were negligent when the record is devoid of evidence establishing when any claimed acts of negligence were performed?

Neither is there any evidence of the knowledge which was available to the manufacturers of these products at the time they were designed and manufactured. What information did these manufacturers have or should they have had regarding any potential hazard of their respective products? Speaking specifically about this situation, some of the questions which went unanswered by the proof are: What information was known or chargeable to the manufacturer of the wheel and the tire machine that Uniroyal tires might explode at all? How much did they know about tire explosions? How much should they have known? Without proper evidence establishing applicable times, the jury would have been unable to answer these questions without indulging in sheer speculation. All that was before the trial court and jury is the statement of Dr. Milner that in his opinion certain corrections could be made in the machines, although he conceded that the manufacturer itself did not agree with him. There is no evidence in the record to establish when the need for these changes became apparent, nor as to feasibility—all of which is a natural product of Uniroyal's use of plaintiff's expert.

Idaho has recognized that in proving a case in negligence, the basic test is whether the conduct of the defendant measured up to that of the ordinary prudent person acting under all circumstances and conditions then existing. *Alegria v. Payonk,* 101 Idaho 617, 619, 619 P.2d 135, 137 (1980); *Messmer v. Ker,* 96 Idaho 75, 79, 524 P.2d 536, 540 (1974); *Nagel v. Hammond,* 90 Idaho 96, 102, 408 P.2d 468, 472 (1965). All of these cases state that the actions complained of are to be compared to the ordinarily prudent person's actions under all circumstances and conditions *then* existing. In this case, the jury did not know when "then" was. All we have is an expert's opinion that modifications could be made as of the time of his testimony improved upon the safety of those products. This hardly proves a case of negligence, contrary to the majority's cavalier assertion. In fact, it does not even rise to the level of a *prima facie* case, which even in a pure comparative negligence case is essential before the placing of these nonparties on the jury verdict form. A negligence action focuses on the acts of the parties, in which regard it has always been thought necessary to make a case. Whatever the nonparties did or did not do has not been sufficiently developed.

In sum, the trial court correctly perceived that there was not enough proof in the record to justify placing the Coats Company and the Kelsey-Hayes Company on the jury verdict form because of Uniroyal's contention that each or both were negligent, and such was a contributing cause of the plaintiff's injuries.

*Henderson v. Cominco American Inc.,* 95 Idaho 690, 700, 518 P.2d 873, 883 (1974), is in total harmony with the foregoing discussion where this Court stated that the party claiming a defective product has the burden of proving by a preponderance of the evidence that the allegedly defective product caused the harm complained of and that the party with the burden in that case—Henderson—had failed his burden of proof, and, therefore, reversed a judgment in his favor.

*Henderson* involved the acts of *parties to the suit.* Our case does not. Rather, our case involves a defendant on cross-examination attempting to prove either a negligence or strict products liability cause of action against *nonparties to the suit*—parties not represented by legal counsel who would by a motion for directed verdict obtain a ruling that the evidence was insufficient. Here we have a majority telling the trial court to conduct another trial on liability with the doors thrown open wide to wild

speculation as to whether the nonparties should be assessed some fault so that Uniroyal's responsibility in strict liability will be diminished, a most unsatisfactory and unfair proposition.

As *Henderson* teaches, the burden was on Uniroyal to prove a cause of action against the nonparties. It did not, and, accordingly, pursuant to *Henderson*, Uniroyal's argument for reduction in damages was properly denied on the basis of insufficiency of evidence.

### B.

There is also insufficient evidence to prove *as comparative fault* that either Kelsey-Hayes or the Coats Company were responsible for providing Vannoy's employer with a defective and unreasonably dangerous product under 402A of the *Restatement (Second) of Torts* as adopted by Idaho in *Shields v. Morton Chemical Co.*, 95 Idaho 674, 676, 518 P.2d 857, 859 (1974). Section 402A states, in pertinent part, the following:

> One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property....

The important statement relevant to this case is "one who sells any product in a defective condition...." *In other words, the defective condition must exist at the time it is sold.* There is not a scintilla of proof in this record to establish the time that the wheel and the tire mounting machine were sold to Vannoy's employer, or that, at the time and the then state of the art, the products were defective. Without that proof, how could a jury find that the product was in a defective condition and unreasonably dangerous at the time it left the hands of the defendant? Thus, any claim of strict products liability against the nonparties, Coats Company and Kelsey-

Hayes, must fail, because of failure of proof on an element of products liability law as outlined by Idaho case law—which case law was allowed to stand in 1980 when the legislature decided that it would occupy the field of strict products liability.

### III.

The district court, in deciding this issue below, reviewed *Pocatello, supra,* and *Lasselle, supra,* and concluded that comparative fault principles are not applicable to strict product liability except as under the legislative guidelines. If the majority is determined to usurp the legislative function, it would more appropriately not apply it to the instant case, but to all cases tried after the filing of its opinion.[4] When California adopted comparative fault principles in strict product liability cases in *Daly v. General Motors Corp.*, 20 Cal.3d 725, 144 Cal.Rptr. 380, 575 P.2d 1162 (1978), it stated on page 391, 575 P.2d page 1173:

> It remains for us to decide the extent to which comparative principles are to be applied to strict liability actions other than those hereafter filed. *We conclude that, for reasons of public policy and the reasonable expectations of the parties to this action and the litigants generally, the principles herein expressed shall apply to all cases in which trial has not begun before the date this opinion becomes final in this Court.* No judgment based upon the trial which has commenced prior to the finality of this opinion shall be reversible on appeal on the sole ground that principles of comparative fault were not applied. If any such judgment is reversed on appeal for other reasons, the principles herein expressed will be applicable to any retrial commenced after its opinion becomes final in this Court.

In *Duncan v. Cessna Aircraft*, 665 S.W.2d 414, 434 (1984), a case relied upon heavily by the majority, that court also

---

**4.** In that manner the majority would decide the issues presented on the law as it existed at the time of trial—just as the trial court did. In that manner an activist majority would retain some small degree of credibility. Rather than apply the law, however, the majority chooses to make new law.

declared that the new rules announced concerning comparative fault in strict liability cases would only have prospective application.

Prospective rulings are not new to Idaho. The Court utilized this principle when it abolished governmental immunity in *Smith v. State*, 93 Idaho 795, 473 P.2d 937 (1970). In the instant case, the trial court followed the law that was available in both *Pocatello* and *Lasselle*, which was that in *negligence* cases, the jury should have the opportunity to compare the negligence of all parties whether or not they are parties to the lawsuit. The trial court's fault, if such it be, a *monstrous* proposition to which I could never subscribe, was in looking at the 1980 legislature's specific and totally unambiguous language as to what circumstances and conduct of what persons or entities could result in diminishing that which at the outset would be a strict products liability defendants' 100 percent responsibility for placing a defective product into the mainstream of commerce. The legislature's enactment is not difficult of reading or ambiguous as to content:

CHAPTER 225

(H.B. No. 577)

AN ACT

RELATING TO PRODUCT LIABILITY; AMENDING TITLE 6, IDAHO CODE, BY THE ADDITION OF A NEW CHAPTER 13, TITLE 6, IDAHO CODE, TO PROVIDE FOR THE SCOPE OF THE ACT, TO PROVIDE DEFINITIONS, TO PROVIDE FOR THE MAXIMUM LENGTH OF TIME PRODUCT SELLERS ARE SUBJECT TO LIABILITY, TO PROVIDE FOR COMPARATIVE RESPONSIBILITY, TO DEFINE CERTAIN CONDUCT AFFECTING COMPARATIVE RESPONSIBILITY, TO PROVIDE STANDARDS OF RELEVANCE FOR CERTAIN EVIDENCE, TO DEFINE INDIVIDUAL RIGHTS AND RESPONSIBILITIES OF PRODUCT SELLERS OTHER THAN MANUFACTURERS, TO PROVIDE FOR THE CONTENTS OF A COMPLAINT AND THE AMOUNT OF RECOVERY, TO PROVIDE A SHORT TITLE; TO PROVIDE SEVERABILITY; AND TO PROVIDE AN EFFECTIVE DATE.

Be It Enacted by the Legislature of the State of Idaho:

SECTION 1. That Title 6, Idaho Code, be, and the same is hereby amended by the addition thereto of a <u>NEW CHAPTER</u>, to be known and designated as Chapter 13, Title 6, Idaho Code, and to read as follows:

CHAPTER 13

PRODUCT LIABILITY

6-1301. SCOPE. The previous existing applicable law of this state on product liability is modified only to the extent set forth in this act.

6-1302. DEFINITIONS. (1) "Product seller" means any person or entity that is engaged in the business of selling products, whether the sale is for resale, or for use or consumption. The term includes a manufacturer, wholesaler, distributor, or retailer of the relevant product. The term also includes a party who is in the business of leasing or bailing such products. The term "product seller" does not include:

(a) A provider of professional services who utilizes or sells products within the legally authorized scope of its professional practice. A nonprofessional provider of services is not included unless the sale or use of a product is the principal part of the transaction, and the essence of the relationship between the seller and purchaser is not the furnishing of judgment, skill, or services;

(b) A commercial seller of used products who resells a product after use by a consumer or other product user, provided the used product is in essentially the same condition as when it was acquired for resale; and

(c) A finance lessor who is not otherwise a product seller. A "finance lessor" is one who acts in a financial capacity, who is not a manufacturer, wholesaler, distributor, or retailer, and who leases a product without having a reasonable opportunity to inspect and discover defects

in the product, under a lease arrangement in which the selection, possession, maintenance, and operation of the product are controlled by a person other than the lessor.

(2) "Manufacturer" includes a product seller who designs, produces, makes, fabricates, constructs, or remanufactures the relevant product or component part of a product before its sale to a user or consumer. It includes a product seller or entity not otherwise a manufacturer that holds itself out as a manufacturer. A product seller acting primarily as a wholesaler, distributor, or retailer of a product may be a "manufacturer" but only to the extent that it designs, produces, makes, fabricates, constructs, or remanufactures the product before its sale.

(3) "Product" means any object possessing intrinsic value, capable of delivery either as an assembled whole or as a component part or parts, and produced for introduction into trade or commerce. Human tissue and organs, including human blood and its components, are excluded from this term. The "relevant product" under this chapter is that product, or its component part or parts, which gave rise to the product liability claim.

(4) "Claimant" means a person or entity asserting a product liability claim, including a wrongful death action, and, if the claim is asserted through or on behalf of an estate, the term includes claimant's decedent. "Claimant" includes any person or entity that suffers harm.

(5) "Reasonably anticipated conduct" means the conduct which would be expected of an ordinary reasonably prudent person who is likely to use the product in the same or similar circumstances.

6–1303. LENGTH OF TIME PRODUCT SELLERS ARE SUBJECT TO LIABILITY.

(1) Useful safe life.

(a) Except as provided in subsection (1)(b) hereof, a product seller shall not be subject to liability to a claimant for harm under this chapter if the product seller proves by a preponderance of the evidence that the harm was caused after the product's "useful safe life" had expired.

"Useful safe life" begins at the time of delivery of the product and extends for the time during which the product would normally be likely to perform or be stored in a safe manner. For the purposes of this chapter, "time of delivery" means the time of delivery of a product to its first purchaser or lessee who was not engaged in the business of either selling such products or using them as component parts of another product to be sold.

(b) A product seller may be subject to liability for harm caused by a product used beyond its useful safe life to the extent that the product seller has expressly warranted the product for a longer period.

(2) Statute of repose.

(a) Generally. In claims that involve harm caused more than ten (10) years after time of delivery, a presumption arises that the harm was caused after the useful safe life had expired. This presumption may only be rebutted by clear and convincing evidence.

(b) Limitations on statute of repose.

1. If a product seller expressly warrants that its product can be utilized safely for a period longer than ten (10) years, the period of repose, after which the presumption created in subsection (2)(a) hereof arises, shall be extended according to that warranty or promise.

2. The ten (10) year period of repose established in subsection (2)(a) hereof does not apply if the product seller intentionally misrepresents facts about its product, or fraudulently conceals information about it, and that conduct was a substantial cause of the claimant's harm.

3. Nothing contained in subsection (2) of this section shall affect the right of any person found liable under this chapter to seek and obtain contribution or indemnity from any other person who is responsible for harm under this chapter.

4. The ten (10) year period of repose established in subsection (2)(a) hereof shall not apply if the harm was caused

by prolonged exposure to a defective product, or if the injury-causing aspect of the product that existed at the time of delivery was not discoverable by an ordinary reasonably prudent person until more than ten (10) years after the time of delivery, or if the harm, caused within ten (10) years after the time of delivery, did not manifest itself until after that time.

(3) Statute of limitation. No claim under this chapter may be brought more than two (2) years from the time the cause of action accrued as defined in section 5–219, Idaho Code.

**6–1304. COMPARATIVE RESPONSIBILITY.** Comparative responsibility shall not bar recovery in an action by any person or his legal representative to recover damages for product liability resulting in death or injury to person or property, if such responsibility was not as great as the responsibility of the person against whom recovery is sought, but any damages allowed shall be diminished in the proportion to the amount of responsibility attributable to the person recovering.

**6–1305. CONDUCT AFFECTING COMPARATIVE RESPONSIBILITY.** (1) Failure to discover a defective condition.

(a) Claimant's failure to inspect. A claimant is not required to have inspected the product for a defective condition. Failure to have done so does not render the claimant responsible for the harm caused or reduce the claimant's damages.

(b) Claimant's failure to observe an obvious defective condition. When the product seller proves by a preponderance of the evidence that the claimant, while using the product, was injured by a defective condition that would have been obvious to an ordinary reasonably prudent person, the claimant's damages shall be subject to reduction.

(c) A nonclaimant's failure to inspect for defects or to observe an obvious defective condition. A nonclaimant's failure to inspect for a defective condition or to observe a defective condition that would have been

obvious to an ordinary reasonably prudent person, shall not reduce claimant's damages.

(2) Use of a product with a known defective condition.

(a) By a claimant. When the product seller proves, by a preponderance of the evidence, that the claimant knew about the product's defective condition, and voluntarily used the product or voluntarily assumed the risk of harm from the product, the claimant's damages shall be subject to reduction to the extent that the claimant did not act as an ordinary reasonably prudent person under the circumstances.

(b) By a nonclaimant product user. If the product seller proves by a preponderance of the evidence that a product user, other than the claimant, knew about a product's defective condition, but voluntarily and unreasonably used or stored the product and thereby proximately caused claimant's harm, the claimant's damages shall be subject to apportionment.

(3) Misuse of a product.

(a) "Misuse" occurs when the product user does not act in a manner that would be expected of an ordinary reasonably prudent person who is likely to use the product in the same or similar circumstances.

(b) When the product seller proves, by a preponderance of the evidence, that product misuse by a claimant, or by a party other than the claimant or the product seller has proximately caused the claimant's harm, the claimant's damages shall be subject to reduction or apportionment to the extent that the misuse was a proximate cause of the harm.

(4) Alteration or modification of a product.

(a) "Alteration or modification" occurs when a person or entity other than the product seller changes the design, construction, or formula of the product, or changes or removes warnings or instructions that accompanied or were displayed on the product. "Alteration or modification" of a product includes the failure to

observe routine care and maintenance, but does not include ordinary wear and tear.

(b) When the product seller proves, by a preponderance of the evidence, that an alteration or modification of the product by the claimant, or by a party other than the claimant or the product seller has proximately caused the claimant's harm, the claimant's damages shall be subject to reduction or apportionment to the extent that the alteration or modification was a proximate cause of the harm.

This subsection shall not be applicable if:

1. The alteration or modification was in accord with the product seller's instructions or specifications;

2. The alteration or modification was made with the express or implied consent of the product seller; or

3. The alteration or modification was reasonably anticipated conduct, and the product was defective because of the product seller's failure to provide adequate warnings or instructions with respect to the alteration or modification.

6–1306. RELEVANCE OF INDUSTRY CUSTOM, SAFETY OR PERFORMANCE STANDARDS, AND TECHNOLOGICAL FEASIBILITY. (1) Evidence of changes in (a) a product's design, (b) warnings or instructions concerning the product, (c) technological feasibility, (d) "state of the art," or (e) the custom of the product seller's industry or business, occurring after the product was manufactured and delivered to its first purchaser or lessee who was not engaged in the business of either selling such products or using them as component parts of another product to be sold, is not admissible for the purpose of proving that the product was defective in design or that a warning or instruction should have accompanied the product at the time of manufacture. The provisions of this section shall not relieve the product seller of any duty to warn of known defects discovered after the product was designed and manufactured.

(2) If the court finds outside the presence of a jury that the probative value of such evidence substantially outweighs its prejudicial effect and that there is not other proof available, this evidence may be admitted for other relevant purposes, including but not limited to proving ownership or control, or impeachment.

(3) For purposes of this section, "custom" refers to the practices followed by an ordinary product seller in the product seller's industry or business.

(4) For purposes of this section, "technological feasibility" means the technological, mechanical and scientific knowledge relating to product safety that was reasonably feasible for use, in light of economic practicality, at the time of manufacture.

6–1307. INDIVIDUAL RIGHTS AND RESPONSIBILITIES OF PRODUCT SELLERS OTHER THAN MANUFACTURERS. (1) In the absence of express warranties to the contrary, product sellers other than manufacturers shall not be subject to liability in circumstances where they do not have a reasonable opportunity to inspect the product in a manner which would or should, in the exercise of reasonable care, reveal the existence of the defective condition which is in issue; or where the product seller acquires the product in a sealed package or container and sells the product in the same sealed package or container. The liability limitation of this subsection shall not apply if:

(a) The product seller had knowledge or reason to know of the defect in the product;

(b) The product seller altered, modified, or installed the product, and such alteration, modification or installation was a substantial proximate cause of the incident giving rise to the action, was not authorized or requested by the manufacturer and was not performed in compliance with the directions or specifications of the manufacturer;

(c) The product seller provided the plans or specifications for the manufacturer or preparation of the product and such plans or specifications were a substantial cause of the product's alleged defect.

(d) The product seller is a wholly-owned subsidiary of the manufacturer, or the manufacturer is a wholly-owned subsidiary of the product seller.

(e) The product seller sold the product after the expiration date placed on the product or its package by the manufacturer.

(2) In an action where the liability limitation of subsection (1) applies, any manufacturer who refuses to accept a tender of defense from the product seller, shall indemnify the product seller for reasonable attorney's fees and costs incurred by the product seller in defending such action.

(3) In any product liability action, the manufacturer of the product shall be indemnified by the product seller of the product for any judgment rendered against the manufacturer and shall also be reimbursed for reasonable attorney's fees and costs incurred in defending such action:

(a) If the product seller provided the plans or specifications for the manufacture or preparation of the product;

(b) If such plans or specifications were a substantial cause of the product's alleged defect; and

(c) If the product was manufactured in compliance with and according to the plans or specifications of the seller.

The provisions of this subsection shall not apply if the manufacturer had knowledge or with the exercise of reasonable and diligent care should have had knowledge of the defect in the product.

(4) A product seller, other than a manufacturer, is also subject to the liability of manufacturer if:

(a) The manufacturer is not subject to service of process under the laws of the claimant's domicile; or

(b) The manufacturer has been judicially declared insolvent in that the manufacturer is unable to pay its debts as they become due in the ordinary course of business; or

(c) The court outside the presence of a jury determines that it is highly probable that the claimant would be unable to enforce a judgment against the product manufacturer.

6-1308. CONTENTS OF COMPLAINT—AMOUNT OF RECOVERY. In any product liability action no dollar amount or figure shall be included in the complaint. The complaint shall pray for such damages as are reasonable in the premises. The complaint shall include a statement reciting that the jurisdictional amount established for filing the action is satisfied.

6-1309. SHORT TITLE. This act shall be known and may be cited as the "Idaho Product Liability Reform Act."

SECTION 2. The provisions of this act are hereby declared to be severable and if any provision of this act or the application of such provision to any person or circumstance is declared invalid for any reason, such declaration shall not affect the validity of remaining portions of this act.

SECTION 3. This act shall be effective with regard to all product liability actions filed on or after July 1, 1980.

Approved March 28, 1980.

1980 Idaho Sess. Laws, ch. 255.

My purpose in displaying the entire 1980 Products Liability Reform Act is to demonstrate the extent to which the legislature determined to, and did, occupy the field. It was only a *"reform"* act in that it did entirely occupy the field which theretofore had been entered only by this Court. Finding nothing amiss in the U.S. District Court's decision in *Sun Valley Airlines* or in this Court's decision in *Shields*, by § 6-1301 it specified that "The previous existing applicable law of this state on products liability is modified only to the extent set forth in this act." Section 6-1304 is important. There, just as the legislature had earlier done in 1971 in the negligence field, it declared that comparative responsibility, as it had with comparative negligence, would not bar a plaintiffs' recovery until and unless it matched or exceeded the responsibility of the person against whom recovery is sought. There is or should be no problem in this case about the applicabil-

ity of § 6–1304, which would compare plaintiff's comparative responsibility with Uniroyal's.

Similarly, there is, or should be, no problem with § 6–1305, (1) failure to inspect; or with (2) use of a product with a known defect. Moving down to (3) of § 6–1305, misuse of a product, there was no evidence here of any misuse of the Uniroyal tire, either by the plaintiff, "the product user," or by a party other than the claimant or the product seller. Concededly, *had* such been established, plaintiff's damages were "subject to reduction or apportionment to the extent that the misuse was a proximate cause of the harm." There is no contention that (4) of § 6–1305 has any applicability. If it did, and alteration were proven, again plaintiff's recovery could have been reduced or apportioned "to the extent that the alteration or modification was a proximate cause of the harm." I.C. § 6–1305(4).

It is thus seen beyond dispute that the legislature has occupied the field, and has set the parameters of those circumstances which can result in a plaintiff's loss of any recovery, or reduced or apportioned recovery. Five short years later a majority of the Court has determined to amend the act, and are doing so. On other occasions I have observed that at any time under any circumstances, three members of this Court can do anything they want to do. This is such an occasion. But that does not make it right. Right has always been right, and wrong has always been wrong.

### IV.

Uniroyal's opening brief in this Court sets forth how it believes itself to have preserved the comparison issue for appeal: "Uniroyal, in its Motion for New Trial, etc., set forth the failure to compare as an error made by the Court. (R.Vol. I, p. 241). The Court denied the various post trial motions. (R.Vol. I, p. 256)." Appellant's Brief, p. 26. From there Uniroyal presents quotations and statements from and citations to authority from the courts of Illinois, North Dakota, California, Alaska, Texas, New Hampshire, Oregon, Minnesota, Wisconsin, Kansas, and from various of the federal jurisdictions—following which it makes the assertion that "[a]ll persons or parties contributing to the plaintiff's injuries in the instant case should have been included on the verdict form." Appellant's Brief, p. 39.

Not one whit of that array of authority appears to have been furnished to the trial court, notwithstanding that the motion, although filed on February 24, 1984, was not argued orally until March 27, 1984. The sum total of Uniroyal's written motion relative to comparison of the nonparties is found in the Record at pp. 245 and 247, the fifth part of its motion for a new trial:

(5) Rule 59(a)(7)—This Honorable Court erred during the course of the trial in the following respects:

. . . .

(m) In failing to include Kelsey-Hayes Company and The Coats Company on the Special Verdict.

No statement whatever explained or elaborated upon the grounds which would support this specification of error. Yet, *I.R.C.P. 59(a) requires that "[a]ny motion based on subdivisions 6 or 7 must set forth the factual grounds with particularity."* This intrinsic requirement of Rule 59(a) has been held *mandatory.* Conclusory, general and vague language does not suffice. Uniroyal's wholly conclusory statement that it was entitled to have had the two nonparties on the special verdict form was entirely unsupported by any particularity of the factual grounds. Such failure required that "the motion should have been denied by the trial court." *Scafco Boise, Inc. v. Rigby,* 98 Idaho 432, 566 P.2d 381 (1977). In that case the trial judge did not deny the motion, but conditionally granted it unless Scafco would consent to a remittitur. Here, however, it is true that the trial court in denying the motion for a new trial did not specify as a reason the failure to comply with Rule 59(a)'s requirement that under 59(a)(7), the grounds must be stated with factual particularity. The court compassionately allowed Uniroyal a second opportunity at oral argument to

supply with particularity the grounds which supported its motion, but all, absolutely all, that Uniroyal provided were wholly conclusory remarks—none of which were tied into one bit of testimony or evidence received at trial:

[MR. HIGH:] We would respectfully submit that the Court erred in ... refusing to compare causation between the wheel manufacturer and the tire-mounting machine manufacturer as required under *Pocatello Industrial Park vs.* [and] *Lasselle,* evidence was clear there as to the proximate cause of the accident under the trend of law, to compare all causations, and should have been compared in this case.

Furthermore, your Honor, we would submit that the order of dismissal signed by this Court during the trial, with respect to Kelsey-Hayes, required a comparison in that order. It was an order signed February 9. On that basis, your Honor, we would ask that the Court grant one of our three alternative motions.

THE COURT: Mr. Pedersen, you may respond.

MR. PEDERSEN: Well, in the first place we only have to compare negligence if there was proof of negligence, I don't think any kind of order signed by the Court could alter that fact. There would have to be a showing of negligence, or a showing that the other products were defective, and my first and foremost argument on that statement, it was in chambers, it wasn't evidence of negligence, how could the jury say that the tire manufacturer—that the tire was manufactured negligently or designed negligently, the jury didn't even know when it was manufactured or when it was designed. How could the jury find that the wheel was defective, it may have been manufactured before any of these blow-ups, it would be pure speculation to suggest that there was adequate proof ... to establish that there was a causal link between any of these. ...

....

... [H]ow can they say the other products were the proximate cause, the legal test is not the [sic "their"] proximate cause, it's whether or not the tire was the proximate cause. *They don't even argue or cite cases,* they base it on some sort of superseding, intervening cause, which wouldn't have any application anyway.

We submit, your Honor, that the defendant has not shown any legal reason in this case why it should be retried.

In another contention, the one he gives the most significance to, is really improper both on a factual basis, no facts in the record, either in chambers nor in his argument today has he addressed the question of how could it be proven that the product was defective at the time of manufacture if there was no proof of the date of manufacture of those products.

Secondly, how could it be proven that the products were defective or negligently designed if there is no proof of what the state of the art was, or whether there was ever even any knowledge of tire blow-ups at the time of manufacture. He has not raised sufficient grounds for judgment n.o.v., new trial.

I'll finish up by addressing the question on remittitur.

....

THE COURT: Mr. High, you may respond.

MR. HIGH: No rebuttal, your Honor.

THE COURT: At this time the Court is going to order that the motion for judgment n.o.v. and the motion for new trial will be, in all respects, overruled and denied.

The two best points I think that Mr. High raises, I feel number one, that the evidence does not—just did not justify instructing the jury on any defects in the other products used in the case, other than the Uniroyal tire, and therefore no error in making—no making such an instruction.

Tr., pp. 707–11 (emphasis added). Uniroyal's effort fell far short of compliance with the rule. The trial court most

obviously was not, either in the written motion, or an oral argument on the motion, provided with any factual particularity at all, and for certain not with any which convinced him that out of whole cloth he should expand the 1980 Products Liability Reform Act so as to include on a special verdict nonparties whose conduct did not come within the legislative purview of what type of conduct, and by what parties, could diminish "the heightened duty and liability of the manufacturer of a defective product."

## V.

Uniroyal in its reply brief makes an interesting concession as to that array of authority set out in its opening brief—a concession which one would think would have caught the eyes of Justice Bakes in the writing of his opinion:

> Plaintiff was correct in reporting that *Uniroyal has cited this Court no authority wherein a non-party was compared in a products liability action.* Appellant's Reply Brief, p. 15.

Uniroyal's sole response to this: "Conversely, neither has Plaintiff cited the Court to such a case where a comparison was not permitted." Appellant's Reply Brief, p. 15. Putting aside that Judge Meehl's decision in this case is one recent holding on the exact issue, it would hardly seem that Uniroyal would expect to carry the day, i.e., of persuading an appellate court that, in that state of precedential equipoise, the trial court was clearly in error. Moreover, although not apparently troubling the majority who agree on the opinion for the Court, it would seem that any party in presenting post-judgment motions should not be allowed to use a scatter-gun *unsupported by any authority* and then scurry into the appellate clamoring out against the error in the trial court's decision. Recollection tells me that one member of this Court has decried such conduct as sandbagging the trial court—a practice to be discouraged, if for no other reason than because it is judicially inefficient. One would like to think that on appeal the reviewing court is examining not only the same record which was before the trial court, but for the most part, at least, also the same authority and arguments. Returning to page 15 of the Uniroyal reply brief, after its assertion that Vannoy's authority is no more on point than Uniroyal's, Uniroyal apparently claims one-upmanship in that:

> Uniroyal has, however, cited this Court to numerous cases *where comparisons were made between defendants,* some of who were product manufacturers. See: *Wilson v. B.F. Goodrich,* [292 Or. 626], 642 P.2d 644 (Or.1982) and *Busch v. Busch Construction, Inc., supra.*
>
> Appellant's Reply Brief, p. 15 (emphasis added).

The point of this thrust escapes me. Defendants, per se, by nomenclature, are parties. Sometimes the plaintiff may name more than one party defendant. If plaintiff names only one defendant, that defendant may implead yet another person who becomes party to the action. And where plaintiff names two or more defendants, each of those defendants can implead other party defendants, and so on. Such third-party defendants practice may be pursued in order to place the blame elsewhere. In California, a plaintiff who has not named as his own defendant a third-party defendant later brought in by a defendant can (probably after discovery has proven helpful) accept that third-party defendant as a plaintiff's defendant. All of which is not to attempt a lecture on third-party practice, but to set the stage for some observations which to my mind are highly pertinent to our review on appeal.

The complaint in this case was filed in September of 1982. The complaint named as defendants: (1) Uniroyal, (2) Kelsey-Hayes Company (wheel manufacturer), (3) Hennessey Industries, The Coats Company (manufacturer of the tire-mounting machine), (4) The Tire and Rim Association, Inc., and (5) Terry Brennan. Count Two of the complaint was founded on strict products liability. Trial did not commence until February of 1984. Uniroyal's answer to the complaint was filed in November of

1982. "Uniroyal denied the claims of Vannoy, alleging that the accident was proximately caused by the combined conduct of Vannoy, the Kelsey-Hayes Corporation and/or Hennessey Industries/The Coats Company." Uniroyal's opening brief, p. 1. Uniroyal was the first of the pleaded defendants to answer the complaint.

It did allege as the first of six affirmative defenses that plaintiff's injuries were chargeable to the acts or omissions of the other named defendants: (1) the Coats Company, a division of Hennessey Industries, (2) Kelsey-Hayes Company, (3) the Tire and Rim Association, Inc., and (4) Terry Brennan.[5]

Inexplicably, Uniroyal chose not to follow up on its allegations alleging that the other defendants were all the responsible parties for plaintiff's injuries by filing a cross-action against them claiming contribution or indemnity. Obviously, so it would seem, had Uniroyal done so, it would have kept both The Coats Company and Kelsey-Hayes in the law suit notwithstanding plaintiff's settlement with each, followed by plaintiff's dismissal. How Uniroyal intended to prove its allegations against those defendants is unknown. What is known, however, that when those two defendants were dismissed prior to trial, Uniroyal's *only* effort in the direction of proving the allegations of its first affirmative defense was to make use of its cross-examination of Dr. Milner, plaintiff's expert witness, to attempt to establish enough causative fault on the part of those two defendants.

When plaintiff's case went to the jury on a charge of Uniroyal's strict products liability only, the theory of negligence having been dropped, whatever Uniroyal had developed by using Dr. Milner as its own witness was wholly insufficient to have warranted the jury being allowed to consider Uniroyal's allegations that The Coats

Company and Kelsey-Hayes were responsible in any part for the explosion of the Uniroyal tire. And, as I have been at pains to point out, Uniroyal did not in its post-judgment motions or in arguing these motions, ever lay before the trial court with particularity the factual background with which it would persuade the trial court that it was in error.

Moreover, where Uniroyal, in charging Kelsey-Hayes and The Coats Company with the conduct which injured Vannoy did not choose to name them as third-party defendants, it also thusly eschewed the opportunity of keeping them in court so that, at least as between all defendants originally named, the jury could, perhaps, apportion for later purposes of contribution or indemnity. Instead, Uniroyal, having failed in every respect, comes to this Court to argue, **FOR THE FIRST TIME,** that which it never argued to the trial court—either the law or the facts. Luckily for it, and boding ill for the science of jurisprudence in Idaho, it has found a Court which will at one fell swoop amend the recent law of the legislature, and decide the issues in accordance therewith.

## VI.

Beginning at page 39 of Uniroyal's opening brief filed in this Court, Uniroyal contends: "The evidence of the wheel and tire mounting machines contribution to the cause of Plaintiffs' injuries was provided by Plaintiffs' own expert, Dr. Alan Milner." Dr. Milner was indeed called as an expert witness on plaintiff's case. Uniroyal's counsel on cross-examination of Dr. Milner was successful in its attempt to steal and use him as its *only* witness in an effort to establish some kind of contributing fault or conduct attributable to the two non-parties who had constructed the tire-changing machine and built the 16½ rim (wheel). Re-

---

5. Not admitting any liability, Uniroyal's second affirmative defense alleged negligence on the party of Jerry Vannoy and that "his negligence was as great, or greater than, any alleged negligence of this answering defendant [Uniroyal]." Other affirmative defenses alleged Vannoy's as-

sumption of the risk, his misuse of the various products (the tire, the rim, the mounting machine) manufactured by the defendants, which misuse was the cause of the injuries and damages.

turning to Uniroyal's brief, page 39, the argument, with citations, goes thusly:

> Dr. Milner identified the mountain machine used in this case as a Coats 30–30. (Tr. Vol. II, p. 339, L. 3–12). Dr. Milner further testified that the machine contributed to the accident. (Tr. Vol. II, p. 339, L. 23). It contributed to the accident because it acted as "launching pad." (Tr. Vol. II, p. 340, L. 3). It also lacked a pressure line regulator. (Tr. Vol. II, p. 341, L. 16). The machine was further defective because it lacked an overpressurization alert system. (Tr. Vol. II, p. 343, L. 3). Finally, Dr. Milner testified that the machine was a contributing cause of the accident. (Tr. Vol. II, p. 349, L. 1).

Turning from the brief to the cited pages of Volume II of the transcript (339, 340, 341, 343, 349):

### CROSS–EXAMINATION

BY MR. HIGH:

Q. Dr. Milner, did you ever determine what type of mounting machine was used to mount this tire on this rim?

A. Yes, a Coates machine.

Q. Was it a Coates 30–30 machine?

A. I believe it was. Mr. Pedersen has photographs of it.

Q. And you believe, do you not Dr. Milner, that the Coates 30–30 machine contributed to the accident, don't you?

A. Well, let me say this about that, the testimony I heard about the involvement of the machine is somewhat in conflict. There is testimony [the tire] was on the machine at the time of the explosion, and in the sense if it's on the machine at the time of the explosion, it contributes to the accident *in the same sense that the floor contributes to the accident, because the Coates machine and other machines like it have a flat surface* from which the tire can be projected, so *it contributes in that sense, if it's sitting on the machine.*

Q. *Assuming that Mr. Vannoy testifies it was on the machine, in your opinion the Coates machine contributed to the accident, correct?*

Tr., Vol. II, p. 339 (emphasis added).

A. *In that sense, yes.* This is always the case with a machine like that.

Q. Because it's a launching pad?

A. Yes, they all have—

Q. Don't you also believe, Dr. Milner, that the lack of a pressure-line regulator on a Coates 30–30 machine contributed to the explosion?

A. Well, it does in cases where there is overpressurization of it, *but in this case, as I recall, there was not.*

Q. Sixty pounds is not over-pressurization?

A. It has to be sixty pounds in order to inflate—in order to inflate to sixty-five pounds there has to be sixty pounds, you could not regulate the level down below that and have enough air to put in the tire.

Q. Dr. Milner, don't you believe, though, that these machines, *these Coates 30–30 machines, are defective, because they have no pressure-line regulator* that limits pressure to forty pounds?

MR. PEDERSEN: Excuse me, I'll have to object to this line of questioning as not within the scope of direct examination.

. . . .

Tr., Vol. II, p. 340 (emphasis added).

. . . .

THE COURT: The Court is going to overrule the objection. You may answer the question.

THE WITNESS: Would you restate the question, please.

Q. The question was: Don't you believe that the lack of a pressure-line regulator on the Coates machine was a contributing cause to the accident?

A. I think *it's a contributing cause if it's overpressurization, but not to forty pounds,* because if you have only forty pounds—let me tell you what I have said, when I've been asked, I think—

**564**

MR. HIGH: Just answer the question.

THE WITNESS: I can't answer your question.

MR. PEDERSEN: Your Honor, he needs an opportunity to answer the question.

THE COURT: I'm going to indicate that you've answered the question. The answer was *not overpressurization,* so the Court is going to allow that answer to remain.

. . . .

Tr., Vol. II, p. 342 (emphasis added).

. . . .

Q. *Do you believe there should be* an alert system?

A. I believe that there should be a double position pedal, which would introduce the air, and *when the air is above a pre-determined figure, and 40 would be as good a figure as any,* although it wouldn't necessarily preclude the accidents, *there should be some audible signal that more than that pressure is there,* because in passenger tire cases, this can be most of the tires mounted on machines, they are passenger tires, not sixty-five pound tires.

Q. And this machine does not have such a system?

A. No.

Q. You believe that's a defect in these machines?

A. I believe all these machines could be improved.

. . . .

Tr., Vol. II, p. 343 (emphasis added).

Q. Then on the next page [of a deposition handed to the witness], page 45, you were asked "Q. In that case is it your opinion that the Coates tire machine was a contributing cause of this accident?"

"A. Yes. Certainly I think I testified to that." Is that not what it states in there?

A. Yes, that's correct.

Tr., Vol. II, p. 349.

So much for Uniroyal's proof of causal fault on the part of the tire-changer. Its brief then contends, on p. 40, that:

Dr. Milner also provided testimony with respect to the wheel involved in this case. In direct examination he described the "anomaly in the design" of the 16.5 inch wheel which permitted a 16 inch tire to be introduced. (Tr. Vol. II, p. 272, L. 1). Dr. Milner, on cross-examination, admitted that the basic problem of a mismatch of a 16 inch tire to a 16.5 inch wheel was the initial inability of the tire being able to fit over the anomaly of design of the wheel, and the wheels visual similarity to a proper sized wheel. (Tr. Vol. II, p. 356, L. 1). It was the design of the wheel which set the precondition of the explosion, or in other words, was the "the fuse on the bomb." (Tr. Vol. II, p. 356, L. 6). He testified that the wheel should be configured so that it would not accept a 16 inch tire. (Tr. Vol. II, p. 357, L. 1). He described the ability to mount as an "internal defect" of the wheel. (Tr. Vol. II, p. 357, L. 22). Finally, Dr. Milner testified that the wheel lacked an alert system and was improperly marked. (Tr. Vol. II, p. 359, L. 19).

Turning to the cited pages of the transcript (272, 356, 357, 359):

[ON DIRECT]:

A. You are referring to the reason why it [the tire being mounted] might hang up?

Q. Yes.

A. Well, there are two general circumstances in which this occurs. Most of them, the vast majority of explosions occurs, for instance, when a 14-inch tire is on a 14-inch wheel, or a 13-inch wheel, or a 16-inch—but there is an anomalous situation that can arise in which there are two kinds of wheels, one which belongs to a different family than the other. There is the so-called 15 degree wheel, which was the wheel in question in this accident, and these are somewhat different in design than other wheels, although they appear almost identical,

and it's possible in some of these cases for the 16-inch type to inadvertently be introduced onto a 16.5 wheel. The reason for that, the 16.5 wheels are slightly larger than the 16-inch wheels, some anomaly in the design, the flange diameter it has to go over is actually larger in the small sized wheels, this pressure to pull these tires onto the 16.5, and inadvertently creates a situation which is one of the causes of this kind of situation.

Q. Let me stop you there to make sure we all understand something that may be confusing.

Q. Which is the larger wheel, the 16.5 wheel or the 16-inch wheel?

A. In terms of over-all diameter, the amount of diameter here, which the tire has to go over, *the 16.5 is actually slightly smaller in this diameter than is a 16*, and *I think it's usually about three sixty-fourths of an inch*, just a little bit.

. . . .

Tr., Vol. II, p. 272 (emphasis added). [ON CROSS:]

Q. The basic problem of a mis-match of a 16-inch tire to a sixteen and a half inch wheel is the initial ability with which the tire can be mounted on the wheel, is that right?

A. Yes, that combined with the visual similarity.

Q. In fact don't you refer to that, this low circumference, lesser circumference of the sixteen and a half inch wheel as, "the fuse on the bomb"?

A. *It is in some circumstances*, it sets up a situation where you can have a hangup.

Q. Don't you believe it's "the fuse on the bomb"?

A. I don't know if I've used that language, *but you could. It sets the precondition for a hangup, although not necessarily for an explosion.*

Q. The design of the wheel sets that up, that pre-condition?

A. The pre-condition for the hangup, yes.

Q. It's the ability, the ease, and if that's easier, if it's smaller, to put a 16-inch tire on a sixteen and a half inch wheel than to put it on a 16-inch wheel—

A. *I don't think it's necessarily easier.* You've got to consider the depth of the drop center, and *in my experience it's been indistinguishable, the difference,* I've not found it easier, or more difficult.

Q. Don't you believe that if you're going to have

Tr., Vol. II, p. 356 (emphasis added). a 16-inch tire, the wheel should be configured in such a way that you can't put a 16-inch tire on a sixteen and a half inch wheel?

A. I think it should, yes. I think that kind of wheel should be precluded, the mounting of the 16-inch tire, I think it should be so designed—

Q. This wheel doesn't, does it?

A. No.

Q. Who makes this wheel?

A. Kelsey-Hayes, I think.

Q. If this wheel were modified marginally, by Kelsey-Hayes, this 16-inch tire wouldn't go on it—

A. Are you telling me or asking me?

Q. Would it, if it were modified, if it was marginally modified?

A. Well, I think that if—I can perceive of ways in which the wheel could be modified to preclude the introduction of a 16-inch tire on it. *The manufacturer of it says it cannot.*

Q. But you can?

A. I have not done it, but I don't see any reason—

Q. You believe that's an internal defect of this thing, this wheel?

A. I think it is, yes.

. . . .

Tr., Vol. II, p. 357 (emphasis added).

. . . .

Q. You believe, Dr. Milner, that if you're going to have a sixteen and a half inch wheel, that it should be identified by some type of paint scheme?

A. I think it should. There should be some way to visually distinguish it. I think I've said in the past that *a wheel like that should have some distinguishing thing that ought to be developed* to alert people to it.

Q. At the minimum it should have some type of—well, it should have the size marked on it properly is that correct?

A. The size on it is inadequately marked.

Q. There should be some kind of alert that it's a sixteen and a half inch, don't put a 16-inch tire on it, correct?

Tr., Vol. II, p. 359 (emphasis added).

A. Well, I wouldn't say that, because I don't think you should write the word "sixteen" on it.

Q. You should have some—

A. I don't think that's a good idea at all, a person seeing sixteen—that has got to go into it.

Q. But *some type of an alert should be* on it?

A. I would think so, yes.

Tr., Vol. II, p. 360 (emphasis added).

So that there will be no doubt, let it be clearly understood that the foregoing exercise is *exactly* the testimony which Uniroyal relied upon in its brief, pages 39 and 40, to support its contention that the trial court should have allowed the jury to consider the comparative responsibility of the two nonparties, and which the majority now rules was that sufficient that "the jury would have been entirely justified in allocating to the mounting machine manufactured by Coats, and to the wheel rim manufactured by Kelsey-Hayes, some or all of the responsibility for proximately causing the damages to the plaintiffs." Once again I much fear that I find myself in the wrong profession. It is frightening to know that Justice Bakes has written that statement for the majority after making a review of the evidence. That "review of the evidence" bears a startling similarity to that which I have above extracted from plaintiff's brief.

It will be for the reader to determine for him or herself whether Uniroyal's capsulized version of the testimony can withstand the scrutiny of an actual examination of the questions put to Dr. Milner and his answers.

Justice Bakes declares for the majority that the testimony of Dr. Milner, as per Justice Bakes' recitation of that testimony, "was much more extensive than the evidence in *Fouche v. Chrysler Motors Corp.*, 107 Idaho 701, 692 P.2d 345 (1984)." I disagree on three counts. First, I have read Dr. Milner's testimony and agree wholeheartedly with the trial court's view that it was not sufficient to make a case. Second, there was not in this trial any procedure which allows for moving for a directed verdict by a nonparty. In *Fouche* the defendant did so, and the plaintiff's evidence with all inferences had to be viewed in his favor. Third, *Fouche* was not based upon expert testimony, but testimony of an actual demonstration prior to purchase of the vehicle and physical evidence that Fouche did in fact smash into the steering wheel and the windshield. It simply is impossible to accept the contentions Justice Bakes has advanced.

Even less acceptable, however, is the highly questionable and I believe dangerous statement that "in determining comparative responsibility or comparative causation it is not necessary to establish that all persons included on the verdict form would be liable for some or all of the damages attributable to their conduct or product." Sheer surmise on my part, I assume that the Justice is confusing liability and responsibility. In special verdict practice, the jury fixes percentages of causative fault or causative responsibility. To the court falls the task of entering a proper judgment where considered are such factors as immunity, caps on liability, and settlements. Frankly, I am unable to understand the drift of his argument, but it has nothing to do with Vannoy's contention that an insufficient case of negligence or strict products liability was made out by Uniroyal in its (mis)use of Vannoy's expert witness.

## VII.

Justice Bakes seemingly believes that the United States District Court's opinion in *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.*, 411 F.Supp. 598 (1976), sustains his own view of how the legislature's 1980 Reform Act should be read and understood, and, perhaps why it should be judicially amended at Uniroyal's behest. That action appears to have been initially filed by Sun Valley Airlines against corporation defendants, Avco-Lycoming and Beech Aircraft Corp. Idaho heirs of the five persons killed in the crash also either initiated separate actions or intervened. The title of the action reflects four separate civil actions which were presumably consolidated. The federal court in its hearing a diversity case did not have the benefit of any Idaho statutory law or of any appeal-developed Idaho case law dealing with the ramifications of apportionment of comparative responsibility under *strict products liability*, the theory of case upon which the claims went to trial.[6] Observing that the contention made on post-trial motions was that "comparative causation ... was applied in derogation of the law of Idaho," 411 F.Supp. at 602, the district court then proceeded to outline in succinct but ample language its 1976 views which later, in 1980, appeared to have been accepted when the Idaho legislature entered the field of strict products liability. The United States district court wrote as follows:

A concept fundamental in tort law is that in order for liability to lie, there must be a wrongdoer whose actions violate a duty owed to a plaintiff. A violation of a duty owed, whether it be labeled negligence or strict liability, is blameworthy or culpable conduct. *With the advent of strict products liability, a heightened standard or duty was imposed upon a manufacturer, such that liability results from a defective product which proximately causes injury,* even though the manufacturer was not negligent. However, strict liability is not absolute liability because a manufacturer is not an insurer or guarantor that no one will be injured in using his product. *The manufacturer is under a duty to produce a product which is free from unreasonably dangerous conditions.* A violation of that duty constitutes blameworthiness or culpability or sense of legal fault.

Together with the heightening of a manufacturer's duty, a modification occurs with regard to a manufacturer's defenses in a strict products liability action. A plaintiff's contributory negligence by that label is not a bar to recovery. Nevertheless, *it is well-settled that misuse of a product in a manner unforeseeable to a manufacturer is a defense to strict products liability.* The misuse defense embodies a policy that a manufacturer should not absorb the consequences of a plaintiff's misuse of a product in a way which the manufacturer could not reasonably anticipate.

411 F.Supp. at 602 (emphasis added) (footnotes omitted).

The italicized sentence was based on a statement from this Court's opinion in *Shields v. Morton Chemical Co.*, 95 Idaho 674, 518 P.2d 857 (1974), wherein the Court membership was unanimous in judicially adopting the doctrine of strict liability for Idaho. In *Sun Valley Airlines*, the District Court after observing, as the jury had specifically found, that Sun Valley Airlines, through its employees Smith and Carlton, had misused the aircraft in a manner unforeseeable to the defendant manufacturers, stated that "the jury in this case was asked, consistent with Idaho [existing statutory comparative negligence law] to assign a percentage to the causative conduct of the *parties to this lawsuit.*" 411 F.Supp. at 603 (emphasis added). In that case the Court dealt with no individual or corporate entity who or which was not a part to the lawsuit.

As indicated by footnote 7, the district court relied upon *Dippel v. Sciano*, 37

---

6. In answering special verdict question Nos. 6 and 7, the jury found that the Beech aircraft was defective, and that defect was a cause of the crash.

Wis.2d 443, 155 N.W.2d 55 (1967), for the statement that "strict liability, like negligence per se, is equally capable of causal comparison." What the Wisconsin Supreme Court actually said was:

Strict liability in tort for the sale of a defective product unreasonably dangerous to an intended user or consumer now arises in this state by virtue of a decision of this court. *If this same liability were imposed for violation of a statute* it is difficult to perceive why we would not consider it negligence per se for the purpose of applying the comparative negligence statute just as we have done so many times in other cases involving the so-called "safety statutes." Under the definition of negligence per se set forth in *Osborne* [*v. Montgomery,* 203 Wis. 223, 234 N.W. 372 (1931)], supra, a safety rule can trace its origin to a court decision as well as a statute. The violation of a safety statute can create a condition that constitutes an unreasonable risk of harm to others. If this unreasonable danger is a cause, a substantial factor, in producing the injury complained of, it can be compared with the causal contributory negligence of the plaintiff. *While this discussion of contributory negligence, assumption of risk and comparative negligence may be obiter dicta* because those issues are not before us on this appeal, ....

*Dippel,* 155 N.W.2d at 64–65 (emphasis added).

The Wisconsin court is seen, then, as judicially adopting the doctrine of strict liability, patterned after § 402A Restatement, just as this Court would do seven years later in *Shields.* Since 1967 strict liability has remained *wholly* a judicial doctrine in Wisconsin. The legislature has not entered and has not occupied the field. In Idaho the converse has been true since the passage of the Product Liability Reform Act of 1980. Had the Idaho legislature acted prior to the trial of *Sun Valley Airlines,* the United States District Court would have looked to the legislature's law—not to *Dippel.* Moreover, in my opinion, the United States District Court would not have

read into the 1980 act language which the legislature did not choose to insert.

## ON REHEARING

BAKES, Justice.

A petition for rehearing in this matter was granted and the cause reargued. The Court has reviewed the record and considered the arguments presented by counsel and continues to adhere to the views expressed and the conclusion reached in 1985 Opinion No. 158, filed on November 22, 1985.

DONALDSON, C.J., and SHEPARD, J., concur.

HUNTLEY, Justice, dissenting.

### I.

Although the November 1985 majority opinion of this Court may read well in the abstract, I fear it will be totally unworkable in the actual trial setting, from the standpoint of both the trial judge and the litigating parties, and if this case is permitted to stand, it will do great violence to the orderly trial of this type of case. In addition to providing no real guidance as to the circumstances under which the phantom defendant is to be added to the verdict form, the ruling of the case would seem to run contrary to the salutory policy of Idaho law which encourages settlements. I will address each consideration in turn.

The core issue of this case, which was not addressed by the present majority opinion, is how to make a comparison of responsibility in strict liability cases work in a meaningful manner. The following are considerations:

(a) Can the adversary system work well when we do not truly have adversaries presenting the issues in these kinds of cases?

(b) Normally, the issues to be tried in a case are those "framed by the pleadings," and consideration of all other matters is irrelevant and improper. In this case, when it finally went to trial

there was no pleading by the plaintiff alleging negligence of either the rim manufacturer or the mounting machine manufacturer and there was no cross-claim or third-party claim by any defendant alleging any negligence on the part of those two "phantoms" (Uniroyal did have an affirmative defense). Thus, under our pleading and practice system, (although only notice pleading is required), no party was formally in a position where they had to either prove or disprove the negligence of the two phantoms on the basis of a complaint and answer.

(c) In all fairness to the defendant Uniroyal, if, in fact, Uniroyal desired to reduce its ultimate exposure by presenting the negligence of the two phantoms, it had three opportunities to do so, one of which still remains, that is:

(1) Initially when the phantoms were defendants prior to settlement, the matter would have been fully litigated had Uniroyal filed a cross-claim.

(2) When the settlement was made with the phantoms on the eve of the trial, Uniroyal had the option of, at that point, asking the trial court for leave to file a cross-claim against either or both of the phantoms and it opted not to do so. It would have been fully appropriate for the trial court to condition the dismissal of the two defendants on leave and opportunity for Uniroyal to get its cross-complaints filed. Since all parties were theoretically prepared for trial, it probably would not have required even a delay in the commencement of the trial, but if it would have, the court could have granted a recess if Uniroyal had asked it to do so.

(3) Even having failed to exercise the option of filing a cross-complaint, Uniroyal still to this day has a procedure under the comparative negligence statutes where it can seek contribution, because the cause of action for contribution arises only after Uniroyal is found liable in the first instance and it can now bring its lawsuit against the two phantoms to ascertain their negligence and contribution.

Although the language of the present majority opinion might sound good in the antiseptic atmosphere of the appellate writing process, it really gives the trial court no realistic and workable guideline as to when to include the phantom. Just how much has to be said, by what kind of a witness, about the *possible* negligent contribution to the accident by a non-party before the judge must add that non-party to the verdict form? In effect, our present decision merely says that on the facts of this case we think the mounting machine and the wheel rim were clearly a cause, but we really articulate no standard by which a trial judge can make that determination.

In the instant case, all we have is the trial judge stating:

"... That the evidence does not—just did not justify instructing the jury on any defects in the other products used in the case, other than the Uniroyal tire, ..."

The trial judge having made that finding, it is a bit peculiar that we overrule him.

In short, the opinion leaves the procedure for trying one of these cases in total disarray as it asserts a rule that if some witness makes a statement which, taken alone, would result in a "prima facie case," then a non-party must be added to the verdict form. In many cases, by virtue of depositions or rules of law, the trial judge and attorneys are well aware of the fact that the prima facie case would be rebutted by other testimony or by rules of law applicable thereto. But since the matter is not placed in issue by the pleadings, it will not get litigated.

I suppose that it is possible that, when during the course of a trial, some witness brings up something tending to make a prima facie case against some non-party, the trial can stop in midstream while counsel asks the court to then and there rule as to whether counsel had best get prepared to prove or disprove a case against that phantom. We then would have to excuse

the jury, recess the trial and give counsel opportunity to get prepared on an issue not framed by any party. Such would seem to be a cumbersome way to operate a trial given that, in this case, Uniroyal had the right to join the phantom defendants as third-party defendants or cross-defendants. It is indeed ironic that this state, long a leader in innovation designed to encourage efficient and expeditious litigation, will now open itself to this kind of abuse of the judicial process.

What does the resulting verdict, with the phantom defendants included, ultimately mean? Are those non-party phantoms bound by the verdict in any way? Can the plaintiff collect from either one of them? Can the true defendant get contribution based on that verdict? The answer to all three questions is "no." The liability of the phantoms will probably have to be litigated again.

It is appropriate to further consider the effect of this decision on the practice of settling lawsuits. It is true that there remains the device of taking a covenant not to execute, with the settling defendant then sitting through the trial and participating in (lengthening) the proceedings. However, why should such practice be encouraged, especially in those cases where on the eve of the trial the plaintiff recognizes that he only has a case of doubtful or possibly no validity as against one or more defendants?

Our rule of law should be that the "phantom defendant" can be included on the special verdict form only in those cases where the law prohibits joinder in the action (such as liability of an employer barred by the worker's compensation statute). In all other cases, a defendant seeking contribution or appointment of liability should join the other defendants under a cross-claim or third-party complaint.

## II.

Having noted in Part I hereinabove, that the case proceeded to trial before the jury without any complaint, cross-complaint, or third-party complaint charging either Kel-sey-Hayes Company or the Coats Company, Inc. with any responsibility for the accident, it is interesting to note what did remain in the pleadings and invite the attention of court and counsel to the fact that this problem might not be before us had attention been given to the status of the pleadings following the dismissal of the two defendants.

The answer of Uniroyal to the plaintiffs' complaint states in Paragraph V:

> The allegations contained in Paragraphs VIII, X and XI speak to acts or omissions of Defendants other than Defendant Uniroyal, Inc., and therefore Defendant Uniroyal, Inc. takes no position on said allegations.

Paragraph VIII charges Kelsey-Hayes, Paragraph IX charges Uniroyal, and Paragraph X charges the Coats Company, Inc. Accordingly, the status of the Uniroyal answer was that it was taking no position at all on the negligence or strict liability alleged against the two phantom defendants. Therefore, on the basis of its own pleadings, Uniroyal had no right to insist that they be included on the jury verdict, because such would be totally inconsistnet with its position that it "takes no position on said allegation."

Unfortunately, the confusion does not end with Paragraph V of the answer, because the defendant, Uniroyal, was permitted to maintain a "first affirmative defense" which was totally inconsistent with Paragraph V of the answer, the defense reading:

> As a further, separate and affirmative defense to Counts One through Five, inclusive, of Plaintiffs' Complaint, this answering Defendant alleges that any alleged injury or alleged damages suffered by the Plaintiffs were directly and proximately caused by the negligent acts and/or omissions of Kelsey-Hayes Company, the Coats Company, Inc., Hennesey Industries, the Tire and Rim Association, Inc., and Terry Burnan, or their agents, servants or employees.

The pleading of that affirmative defense brings into focus that which I shall address in Part III of this dissent.

At this point, I would note that it is axiomatic (or at least has been until this majority opinion came out) that a party asserting an affirmative defense has the burden of proving the matters therein contained. That burden of proof includes proving all elements of the "cause of action" or defense. As the trial court and counsel noted in their discussion relative to the propriety of including the phantom defendants, there was no evidence presented by any party relative to either (1) the date the equipment was manufactured, or (2) the standards which applied in the industry at that time. Thus, on the face of this record, it is clear that Uniroyal did not meet the burden of proof required to establish its affirmative defense. The trial court was correct in not including the two phantoms on the jury verdict form.

### III.

I come now to a consideration of unfortunate and loose wording in the majority opinion which, if not thoughtfully and carefully analyzed by trial judges and lawyers, will confound the trial of most multi-party actions. This problem arises from our failure to remember how the presentation of evidence ultimately culminates in general instructions to the jury which further result in the presentation of a special verdict form in comparative negligence cases.

I quite agree with Justice Bakes in this opinion and Justice Donaldson, speaking for the Court in *Lasselle v. Special Products Co.*, 106 Idaho 170, 677 P.2d 483 (1983), in the proposition that the jury should have the opportunity to compare the fault of all culpable parties, including both those defendants charged under negligence and those charged under strict liability. However, this case goes beyond *Lasselle* in a way that is subtle, insidious, and totally unworkable from the standpoint of those judges and lawyers attempting to present cases to juries, for reasons I am about to articulate.

In the instant case, if the settlement with the phantom defendants had not been made, and the case had been tried against all three defendants and ultimately submitted to the jury against all three defendants, a special verdict form would have been given asking the following question as to each.

QUESTION NO. 1: Was the defendant Uniroyal negligent, which negligence was the proximate cause of the accident?

QUESTION NO. 2: Was the defendant, Coats Company negligent, which negligence was the proximate cause of the accident?

QUESTION NO. 3: Was the defendant, Kelsey-Hayes negligent, which negligence was the proximate cause of the accident?

QUESTION NO. 4: Was the plaintiff, Jerry Vannoy, negligent, which negligence was the proximate cause of the accident?

The Idaho special verdict form then proceeds to ask the jury to apportion 100% of the negligence among the parties to whom affirmative "yes" answers were given to the above four questions.

Now comes the kicker! *Those four questions would be propounded to the jury on the basis of all of the instructions which preceded.*

Included in those instructions which preceded would be as to each defendant a requirement that the jury determine the merit of its defenses and if any of those defendants prevailed by convincing the jury of any of its defenses, there would have been a "no" answer to the appropriate one of the first three questions and the jury would not have apportioned any percentage to that defendant.

In a word, we are asking the jury to compare *fault.* Thus, the rationale of *Sun Valley Airlines, Inc.* of comparing those parties for whom culpability, blameworthiness or some form of fault has been determined in the following language quoted by the majority opinion.

"Once *culpability, blameworthiness* or *some form of fault* is determined by the trier of fact to have occurred, then the labels denoting the 'quality' of the act or omission, whether it be strict liability, negligence, negligence per se, etc., becomes unimportant. Thus, the underlying issue in each case is to analyze and compare the causal conduct of each party, regardless of its label." *Sun Valley Airlines, Inc. v. Avco-Lycoming Corp.*, 411 F.Supp. 598, 603 n. 5 (1976). (Emphasis supplied).

Note that we *do not* ask the jury to fix a percentage of negligence upon every party for whom the evidence shows some *prima facie case of negligence* where the defendant has shown a defense which rebuts the prima facie case of causation.

In other words, there is not one set of questions on the special verdict form apportioning "prima facie negligences" and a second set of questions apportioning fault, culpability, and blameworthiness. Stated again, the jury only apportions negligence among those who are responsible to the plaintiff under the mandate of *all* of the instructions including consideration of the defenses.

The foregoing points out the serious mischief of the majority opinion. Apparently, Justice Bakes is instructing Idaho's trial judges to ignore the instructions as a whole, and now place upon the special verdict form all individuals or corporations, whether a party or not, for whom a prima facie case of negligence has been made out by the testimony of some witness.

His opinion contains the following language at page 15:

In determining whether or not to include additional parties on the verdict form, the question is not whether a judgment would or could be rendered against that person, but whether or not his conduct or his product caused or contributed to the accident and injuries. Thus, in the case of the Coats Company and Kelsey-Hayes, the issue is whether the tire mounting machine and the wheel rim were the cause, in whole or in part, of the accident and injuries to the plaintiffs. If they were, the special verdict form should require the jury to allocate that causation to them, regardless of whether the Coats Company and Kelsey-Hayes could have a judgment rendered against them as a result of the damage caused by their tire mounting machine and the wheel rim.

That has never been the rule of law in Idaho, it has never been the way special verdict forms are drafted in Idaho since 1971, and I am fearful that Idaho's trial judges and lawyers are going to wonder whether any of us remember anything about the nuts and bolts of presenting a case to the jury. Apparently, if this majority opinion is to be followed, Idaho trial judges are going to have to submit two sets of special verdict forms to the jury, one comparing prima facie cause testimony and a second comparing fault.

### IV.

Part I of the majority opinion concludes with the following sentence, which is a jewel:

"We need not, and do not, decide in this action to what extent the judgment or the issues actually litigated would be binding upon the non-parties Coats and Kelsey-Hayes, in subsequent litigation."

We are required under the practice of this Court and a statute to decide all issues necessary to ultimate resolution of the case when it is re-tried. Without knowing the answer to the question posed, the parties cannot know how to proceed in their actions for contribution and indemnification which flow from this case. Obviously, the answer to the issue is that the judgment is not binding on non-parties. To admit that would be to force us to acknowledge the problems I have set forth in Parts I, II and III of this dissent and would also force us to acknowledge that we are, by this decision, wasting judicial resources on the litigation of issues which have no binding effect and result in nothing but the incurrence of expensive litigation of non-issues

by the parties. We should step back and re-think this whole situation.

BISTLINE, J., concurs.